**GLICTRONIX CORPORATION, on behalf of itself and all others similarly situated, Plaintiff,**

v.

**AMERICAN TELEPHONE AND TELEGRAPH COMPANY, et al., Defendants.**

**Civ. A. No. 82–4447.**

United States District Court, D. New Jersey.

Oct. 4, 1984.

Stern, Steiger, Croland & Bornstein by Howard Stern, Paramus, N.J., for plaintiff.

Pitney, Hardin, Kipp & Szuch by Dennis R. LaFiura, Morristown, N.J., and Sidley & Austin by George L. Saunders, Jr., Chicago, Ill., and Sidley & Austin by Stewart A. Block, Ronald S. Flagg, Washington, D.C., and Norman E. Gamble, American Tel. & Tel. Co., New York City, for defendants.

### OPINION

DEBEVOISE, District Judge.

Plaintiff Glictronix Corporation filed this action against the American Telephone and Telegraph Company and its other affiliated defendants alleging violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2.

Now pending are plaintiff's motions (1) for class certification and (2) for partial summary judgment to preclude relitigation of issues decided adversely to AT & T in *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 76 Civ. 2512 (S.D.N.Y.1981), aff'd, 700 F.2d 785 (2d Cir.1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

### *Facts*

Plaintiff, Glictronix Corporation ("Glictronix") a retailer of telephone terminal equipment, alleges that the defendants (hereinafter collectively referred to as "AT & T") engaged in a course of anticompetitive and predatory conduct with respect to the distribution, sale, rental and/or lease of telephone terminal equipment in the geographic markets serviced by the two defendant operating companies, New Jersey Bell Telephone Company and New York Telephone Company. Glictronix alleges that defendants' acts constitute monopolization, attempt to monopolize and conspiracy to monopolize, all in violation of Section 2 of the Sherman Act and a conspiracy to re-

strain trade in violation of Section 1 of the Sherman Act.

The products at issue in this case are two types of telephone terminal equipment: private branch exchange telephone systems ("PBXs") and key telephone systems ("key systems"). A PBX is used for transmitting and receiving telephone calls and switching such calls to a number of connected individual telephones. A key telephone system is used to connect a single telephone station to telephone trunk lines by manipulation of buttons on the face of the telephone.

Reference to the history of AT & T's control over the telephone terminal equipment market is necessary to an understanding of Glictronix's claims.[1] Until 1968, AT & T held an absolute, governmentally recognized monopoly over terminal equipment. It issued tariffs which were filed with the Federal Communications Commission ("FCC"), prohibiting telephone customers from installing any such equipment not obtained from AT & T.[2]

In 1968, the FCC ruled that these tariffs were unlawful. *In the Matter of Use of the Carterfone Device in Message Toll Telephone Service,* 13 F.C.C.2d 420, *recon. denied,* 14 F.C.C.2d 571 (1968). Following this decision, AT & T imposed new tariffs which required that telephone customers who obtained terminal equipment from AT & T's competitors use an "interface device" or "protective connecting arrangement" ("PCA"), to be interposed as a barrier between the AT & T network and the non-AT & T equipment. The PCA had to be leased from and installed by AT & T. The ostensible purpose of the PCA was to protect the network from non-AT & T equipment which might damage it.

The PCA tariff was chosen by AT & T over an alternative method of ensuring pro-

---

1. A detailed discussion of the relevant history may be found in *Litton Systems, Inc. v. American Tel. & Tel. Co.,* 700 F.2d 785 (2d Cir.1983).

2. AT & T tariffs are imposed by AT & T itself on its customers. Tariffs must be filed with the

FCC and can be disapproved by the FCC, but the filing of tariffs constitutes private action by AT & T, not governmental action. See *Litton Systems, supra,* 700 F.2d at 807.

tection of the network, namely the development of a system of certification standards. A certification or registration system would regulate the type of equipment which could be connected to the network, and ensure that potentially harmful equipment would not be connected to the network, at least not without protective circuitry.

When AT & T filed the PCA tariff in 1968, the FCC permitted enforcement of the tariff without either approving or disapproving it. *Carterfone, supra,* 14 F.C.C.2d 571 (1968).

However, in November, 1975, the FCC generally rejected the PCA tariff in favor of a certification system. *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Services (MTS) and Wide Area Telephone Service (WATS), 56 F.C.C.2d 593 (1975).* Although excluded from this ruling in 1975, the equipment at issue in this case was later included in the certification program. *Interstate and Foreign Toll Telephone Service,* 58 F.C.C.2d 736 (1976); *Interstate and Foreign MTS and WATS,* 67 F.C.C.2d 1255 (1978).

The FCC's 1975 ruling stated in unequivocal terms that the PCA tariff provisions "impose[d] an unnecessarily restrictive limitation" and "constitute[d] an unjust and unreasonable discrimination both among users.... and among suppliers of terminal equipment." After cataloging the extensive reports, recommendations and other material the FCC had considered, the filing also concluded that "there has been no demonstration of network harm resulting from the interconnected operation of some 1600 independent local telephone companies and the Bell System ... many of whom purchase and connect without benefit of carrier-supplied connecting arrangements the identical independently manufactured terminal equipment for which the individual user must lease carrier-supplied connecting arrangements." *Proposals for New or Revised Classes of Interstate and Foreign Message Toll Telephone Service (MTS) and Wide Area Telephone Service*

*(WATS),* 56 F.C.C.2d 593, 598 (1975) (first Report & Order). In affirming the FCC's extension of a certification system to PBXs and key systems which had their own protective circuitry, the Fourth Circuit termed the PCA requirement an attempt to preserve "the carriers' private lawmaking authority over independent manufacturers." *North Carolina Utilities Commission v. F.C.C.,* 552 F.2d 1036, 1051 (4th Cir.), *cert. denied,* 434 U.S. 874, 98 S.Ct. 222, 54 L.Ed.2d 154 (1977).

Even after these decisions, PCAs are still required for equipment that does not meet FCC registration standards and for equipment which is not properly installed. *Interstate and Foreign MTS and WATS, supra,* 67 F.C.C.2d at 1256, 1272 n. 21.

Glictronix alleges that AT & T violated § 2 of the Sherman Act, by adopting the PCA tariff and opposing the adoption of certification standards. It alleges that AT & T's imposition of the PCA tariff was unlawful in light of the alleged facts that:

1. the PCA was unnecessary to protect the network from harm;

2. the direct cost of the PCA created an artificial economic barrier to competition in the terminal equipment market; and

3. the tariff was adopted and pressed on the FCC as a delaying tactic, designed to suppress competition in the terminal equipment market until AT & T developed products which could compete effectively in that market.

Glictronix also alleges that AT & T: disparaged the telephone terminal equipment distributed by their competitors (Complaint ¶ 33(a)); prematurely announced to telephone customers the availability of new terminal equipment in order to persuade such customers not to purchase competitive equipment (*id.* at ¶ 33(b)); delayed installation of and improperly installed and maintained PCAs required to interconnect the equipment distributed by plaintiff and other class members (*id.* at ¶ 33(d)); engaged in the practice of reciprocal trading, whereby defendants would purchase goods and

services upon the condition that the supplier of such goods and services would obtain its telephone equipment from defendants (*id.* at ¶ 33(g)); "refuse[d] to sell inside wiring at all, refuse[d] to sell the inside wiring at a reasonable price, refuse[d] to negotiate the sale of inside wiring in good faith, refuse[d] to make timely responses to purchase requests and otherwise sabotage[d] inside wiring obtained by plaintiffs" (Plfs. Brief at 26); and "subjected competitors to unfair and expensive cutover tactics by failing to acknowledge or claiming non-receipt of customer cutover instruction letters; by continuously changing cutover dates; by delivering the wrong Bell trunk line or tie line equipment; by refusing to remove defendants' equipment or lines; by insisting incorrectly that customer difficulties were due to the customer equipment; by installation personnel leaving a job site unfinished; by their destruction of cable on the customer's premises; and by improperly making the cutover to competitor's equipment" (Plfs. Brief at 27–28).

AT & T contends that the equipment included under the headings of PBXs and key systems is diverse. It claims that the design and functions of PBXs vary greatly, with different variations handling from fewer than 30 to thousands of telephone lines. During the relevant period, PBXs could operate through "radically different technologies." The generic term "key telephone system" also encompasses a wide variety of equipment having varying capacities and using varying technologies. Glictronix marketed only a few of the many PBX and key systems in existence during the relevant period. (Glick Dep. at 91–93). Glictronix concentrated its sales efforts on customers seeking equipment for fewer than 200 lines (*Id.* at 96).

AT & T asserts that these different makes and models of PBXs and key systems possessed different potentials for causing harm to the AT & T network. As noted by AT & T, even when the FCC permitted direct connection of PBXs and key systems to the network in 1978, it ruled that PCAs would continue to be required for equipment that did not conform to registration standards, 67 F.C.C.2d 1255, 1272 n. 21 (1978).

One difference among various makes and models of PBXs and key systems found significant by the FCC in its registration orders was the ability of the power supply transformer to prevent power surges from passing through the equipment into the network. According to AT & T, some, but not all manufacturers of terminal equipment, used power supplies listed by Underwriters Laboratories as safe for use with commercial power supplies. AT & T implies that the equipment manufactured by some of the class members would not meet FCC registration requirements, and that, despite the advent of registration standards, these manufacturers would still be required to use a PCA. AT & T asserts that these manufacturers cannot show they were damaged by AT & T's maintenance of the PCA requirement. In addition, the FCC ruled that PBXs and key systems without protective circuitry—even ones that met registration standards—could not be considered harmless until the specific installation of the equipment at the customer's premised was inspected and certified, 67 F.C.C.2d 1255. For example, because telephone lines within a PBX or key system can come into contact with commercial power lines, causing hazardous voltages on the network, the FCC mandated that each non-AT & T installation be certified unless a PCA were used. 67 F.C.C.2d at 1277. AT & T argues that any AT & T competitor whose installation would not pass inspection would require a PCA and cannot maintain that it was injured by AT & T's PCA tariff.

AT & T has offered no evidence that any class member's equipment has actually failed to meet FCC registration standards and has been required to be used with a PCA. Similarly, AT & T has offered no evidence that any class member's installations have failed to pass FCC inspection. Nor has Glictronix offered evidence to the contrary.

In support of its motion for partial summary judgment, Glictronix relies on the jury findings and the opinion of the Second Circuit in litigation brought by Littons Systems, Inc. against the defendants in this case and other AT & T affiliated companies. *Litton Systems, Inc. v. American Tel. & Tel. Co.*, 76 Civ. 2512 (S.D.N.Y. 1981), *aff'd*, 700 F.2d 785 (2d Cir.1983), *cert. denied*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

In 1976, Litton, a terminal equipment manufacturer filed suit alleging the same antitrust violations as are alleged here. The litigation dealt with the same product categories as are in issue here. In *Litton*, AT & T stipulated that PBXs and key systems constituted a relevant product market under the antitrust laws. *See Litton, supra*, 700 F.2d at 791.

The extensive nature of the *Litton* litigation was aptly summarized in *Jack Faucett Assoc. v. American Tel. & Tel. Co.*, 566 F.Supp. 296, 298 (D.C.Dist.Col.1983), *rev'd*, 744 F.2d 118 (D.C.Cir.1984) another case in which a plaintiff interconnect company sought to have the *Litton* findings applied collaterally against AT & T:

> Trial began in 1980, ran for more than five months, generated 18,000 pages of testimony, and 945 exhibits, and concluded with a jury verdict for Litton in January, 1981, for nearly $92 millions as a competitor and $268,000 as a customer of AT & T which the trial count then trebled. .... [O]n February 3, 1983 the U.S. Court of Appeals for the Second Circuit unanimously affirmed. 700 F.2d 785 (2d Cir.1983). Rehearing and rehearing en banc were denied, apparently without a dissenting vote, on March 31, 1983.

After the *Jack Faucett* trial court rendered its decision, the United States Supreme Court denied certiorari in *Litton*, — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

Glictronix submits that AT & T should be precluded from relitigating the following issues which were decided in *Litton:*

*Relevant Product Market*

(1) The relevant product market is the sale and lease of telephone terminal equipment consisting of PBX Telephone Systems and Key Telephone Systems.

(2) Defendants possessed monopoly power in the relevant market.

(3) Defendants had a specific intent to obtain monopoly power in the relevant market.

(4) There was a dangerous probability that defendants would obtain monopoly power in the relevant market.

*Anticompetitive or Predatory Conduct*

(5) Defendants attempted to obtain and did wilfully maintain their monopoly power in the relevant market through the following anticompetitive or predatory conduct:

(a) They filed the tariffs requiring a Protective Connecting Arrangement in bad faith;

(b) They opposed certification of telephone terminal equipment in bad faith;

(c) They intentionally delayed the provision and installation of Protective Connecting Arrangements;

(d) They refused, in bad faith, to sell inside wiring at all or on a reasonable basis; and

(e) They delayed, in bad faith, in making cutovers to customer provided telephone terminal equipment.

*Standing to Sue*

(6) The class plaintiffs in this case have standing to sue for damages as competitors of defendants in the relevant market.

*Defenses*

(7) The Protective Connecting Arrangement was not necessary to protect the telephone network from harm, and any claim that it was necessary is baseless.

(8) The *Noerr-Pennington* doctrine is inapplicable to the anticompetitive or predatory conduct of defendants at issue in this case.

(9) The "sham" exception to the *Noerr-Pennington* Doctrine is applicable to the

anticompetitive or predatory conduct of defendants at issue in this case.

The proposed class of plaintiffs is defined as:

"all persons who engaged in the business of distributing, selling, renting and/or leasing, PBX Systems, both automatic and otherwise, and key telephone systems, of various manufacturers, to subscribers of telephone service in interstate commerce provided by the defendants, New Jersey Bell Telephone Company and New York Bell Telephone Company, and who sustained damages as a result of defendants' violations of the antitrust laws."

(Complaint ¶ 5). According to Glictronix, there are approximately 600–800 identifiable members of the proposed class. The class members include companies with a wide variety of sizes, structures and marketing philosophies.

Glictronix contends that it can establish many essential elements of its case by evidence common to the class. (See Plaintiff's Class .Certification Brief at 3–5). Among the issues Glictronix believes it can establish by common evidence are the relevant product and geographic markets; AT & T's monopoly power in those markets; its claims based on AT & T's promulgation of the PCA requirement and opposition to certification standards; its claims based on alleged anticompetitive practices by AT & T including delay in provision and installation of PCAs, refusal to sell inside wiring at all or on a reasonable basis, delay in interconnection to the AT & T network of competitors' terminal equipment; the fact of injury to each member of the class; and the appropriate measure of damages as to each member of the class.

Glictronix has submitted several reports by experts in support of its motion for class certification. These reports deal exclusively with the effects on the class of the PCA requirement and of the delay in adoption of certification standards.

One of these experts, Thomas R. Pratt, concluded that the imposition of the PCA tariff on all AT & T competitors: (a) result-ed in a significant competitive disadvantage and loss of profits to each proposed plaintiff-competitor; (b) impeded development of the terminal equipment market and reduced competitive activity in that market, and; (c) imposed major constraints on the profitability of each competitor.

Mr. Pratt asserts that the members of the plaintiff class incurred damages in two ways. First, the PCA requirement significantly reduced the volume of sales for AT & T's competitors since the device added significant costs to using and installing competitors' equipment. Since the class members could have earned profits on these lost sales, they have all been damaged to the extent of the lost profits. (Pratt Report at 2–3).

Second, Pratt claims the class members lost profits because the added cost of the PCA forced them to lower their prices in order to stay competitive with AT & T. The need to price their equipment lower resulted in lower profits for each unit of equipment they did sell. (*Id.*)

Pratt served as an expert for *Litton* in its case against AT & T and was one of the principal participants in the creation of a damage study presented by *Litton*. That study concluded:

The plaintiffs were all damaged by the interface device because it stifled the development of the market and thereby reduced the level of sales and profits. The device also damaged the plaintiffs by necessitating an additional reduction in selling prices in order to compete, and by increasing selling, installation, and maintenance costs for each sale. The overall effect of the device was equivalent to the imposition of a discriminatory tariff against each of the plaintiffs which resulted in lost sales and profits for each of the plaintiffs.

(Pratt Report at 4, Appendix to Plaintiff's Brief in Support of Class.Cert.) These findings are generally supported by reports submitted by Dr. Les Seplaki, a professor of economics at Rutgers, and by Samuel M. DeLuca, an independent consultant in the

telecommunications industry and a former employee of New Jersey Bell.

According to Glictronix's experts, the PCA requirement gave AT & T an opportunity to affect every sale of terminal equipment attempted by competitors. Since non-AT & T equipment could only be connected through a PCA provided and installed by a defendant operating company (Plaintiff's Ex. 23, A–307), AT & T was involved every time a non-AT & T sale was attempted.

AT & T activities vis-a-vis competitors in the terminal equipment market are recorded in Competitive Activity Reports, which were compiled on an individual basis for each customer when a Bell operating company was faced with competition for a customer's terminal equipment business. The information in the Competitive Activity Reports included the number of the customers' lines, the nature of the terminal equipment, the number of stations, detailed cost comparisons, reasons for the customer's choice between Bell and the competitor, and a general comments section (See ¶ CC ex. 0, A–1083). In addition, a Computerized Economic Comparison—comparing the costs of Bell and non-Bell proposals—was commonly prepared and distributed to customers.

Mr. Pratt's report presents a methodology for calculating damages and allocating damages among the proposed class members. The Competitive Activity Reports provide much of the curcial information on which the method rests. Glictronix contends that calculation of damages is made manageable by the fact that defendants maintained "quite complete records" of every competitive situation. A formal program of competitive activity reporting was commenced on a nationwide basis by AT & T in 1974 (Gear Dep. at 24–16 to 25–5). But monthly competitive analyses for both New York and New Jersey were compiled throughout the entire period of issue here. According to Glictronix, the periodic analyses of the competitive market provide much of the data necessary to determine the size of the market, the extent of competitive efforts and the amount of the market obtained by competitors.

The Pratt damage methodology provides for allocation among the class members on a yearly basis dependent upon their *pro rata* share of the available market. According to the report, the *pro rata* share is readily ascertainable from the monthly reports. AT & T's reports provided information on the most active competitors and a "wins to attempts ratio" allowing comparison of the competitors' relative effectiveness. Although competitive ranking was done only for the top few companies, both the underlying data and software programming is available to rank the competitive effectiveness of every competitor in the market place. (December 12, 1983 2 Weigman Dep. at 129–25 to 131–16).

AT & T officials have admitted that, by and large, "If a vendor made a number of sales, he would appear on the list" (McNamara Dep. at 112–113). The Competitive Activity reports provide the best available source for quantitatively and qualitatively assessing AT & T's competitors in the terminal equipment market.

AT & T also submits expert testimony, in the form of a report by Dr. Almaris Phillips, a professor of public policy and of economics and law at the University of Pennsylvania. Dr. Phillips contends that the conclusion of Mr. Pratt and Dr. Seplaki that each class member lost sales and profits it would have obtained in the absence of the PCA requirement is predicated on two incorrect assumptions:

"(1) the assumption that, but for the PCA requirement in the Bell System's post-Carterfone tariffs, the particular PBX and key telephone systems marketed by each potential class member would have been directly connected to the network without protective circuit; and

"(2) the assumption that each potential class member would make more sales and more profit in the increased competitive environment that plaintiff assumes would accompany the earlier advent of registration."

(Appendix to Defendants' Class Certification Brief, Tab 1, at 3.) Phillips contends that the first assumption is wrong because, even under the present certification standards, some class members' equipment would have to be used with a protective device either because its design did not meet FCC registration standards or its installation did not pass FCC inspection (Phillips Report at 4–7).

Phillips also suggests that for some class members the cost of compliance with FCC design and installation requirements could be more expensive than the use of protective circuitry. He cites an FCC report as evidence of this proposition. 67 F.C.C.2d 1255, 1256, 1275–76 (1978).

This suggestion is also made in AT & T's brief, which states that "one interconnect company complained to the FCC that its competitors were choosing to use PCAs rather than comply with the registration requirements.... *Customer Provided Equipment and Connecting Arrangement,* 85 F.C.C.2d 868, 883 (1981)." (AT & T's OC brief, p. 45, note.) Glictronix apparently investigated the circumstances of this FCC decision and discovered that the company in question did not deal with PBXs or key systems and therefore was involved in a different product market.

In deposition, Glictronix's expert Pratt did agree that the FCC's 1978 registration program did impose costs on interconnect companies, and admitted that he did not know what all the components of those costs were or whether they were more or less than the PCA requirement for particular types of equipment (Pratt Dep. at 91, 98–99). However, Mr. Pratt points out in his reply affidavit, that even if there were costs associated with the registration program, those costs are imposed on all manufacturers of PBX and key systems equipment. In contrast, the PCA cost was imposed on all manufacturers except the defendants (Pratt Reply Affidavit ¶ 7, Supplemental Appendix to Brief in Support of Class Certification, Vol. II, Tab 6).

Phillips also takes issue with what he terms Glictronix's second assumption: that each potential class member would have made more sales and/or more profit absent the PCA requirement. Phillips interprets Pratt and Seplaki to have argued that in the absence of the PCA requirement, the AT & T competitors would have been able to raise their prices and thereby obtain higher profits. Phillips attacks this notion under the general economic principle that competition will tend to reduce prices to the marginal cost of the efficient competitor (Phillips Report at 13). He suggests that:

> [some] competitors—probably those with better financing, better equipment, expandable sources of supply, better management, and adequate service organization—may have improved their sales, whereas those with higher costs and unattractive products would probably have tendered to suffer reduced sales or complete failure.

(Phillips Report at 17–18). Consistent with Phillips' view was the damage model prepared for the *Litton* case, which Mr. Pratt participated in creating. That model predicted that there would have been a large shake-out of existing interconnect companies that would have been unable to survive if the FCC had adopted registration standards in 1973 (*Id.*)

Pratt and Seplaki respond to Phillips' charge in different ways. Pratt states that he believed that plaintiffs lost profits because of lost sales, not because they could have raised prices in the absence of the PCA requirement. (Pratt Reply Affidavit, ¶ 11, Appendix to Brief in Support of Class Certification, Supplemental Vol. II, Tab 6). Seplaki states that lost profits were due not to an inability to make more sales, but due to "the necessity of reducing per-unit profit margins as a result of the PCA requirement." (Seplaki Reply Affidavit, *Id.* at Tab 7).

Pratt attacks Phillips' argument for its allegedly erroneous substitution of a "hypothetical world" in which Phillips analyzes what would have happened had registration been adopted in 1973—for the "real world" in which according to Pratt, all class members lost at least some sales be-

cause of the costs added by the PCA requirement. Dr. Seplaki similarly responds that he, Seplaki, "concentrate[d] on the impact of the PCA as a factual matter in the real world that existed during the relevant period." (Seplaki Reply Affidavit, ¶ 10). His conclusion is that because of the cost of the PCA, which was imposed on all non-AT & T competitors, all class members were faced with the choice of either lowering their prices to absorb the cost of the PCA for the customer or losing some sales. (Seplaki Reply Affidavit ¶ 6).

Phillips also assails Pratt's methodology for establishing and allocating damages. He identifies "two serious flaws that render it unworkable and contrary to the interests of many of the potential class members." (Phillips Report at 19). Phillips first criticizes the model because it "allocate[s] damages among class members based on their actual market share for each year from 1970–1978 in the real world." (*Id.*) He contends that strong companies, which might have increased their market share in the absence of the PCA requirement, will be foreclosed from making this showing under Pratt's model. Similarly, AT & T will be foreclosed from arguing that weaker companies' share of the market would have shrunk in a freely competitive environment. Second, Phillips contends that the model fails to account for companies which dropped out of the market. Under Pratt's method these companies would be foreclosed from showing what market share they would have captured if they had not been driven from the market. Similarly, companies which delayed their entry into the market because of AT & T's conduct would not be permitted to show what market share they would have won had they entered sooner. For these reasons, Phillips believes allocating damages in this case will place class members in conflict with one another and would have to be done on an individualized basis.

Nothing in plaintiff's experts' reports addresses how Glictronix's damage claims arising from AT & T's anticompetitive practices (such as delaying the interconnection of competitors' equipment to the network) can be proven by evidence common to the class.

### Conclusions of Law

#### I. Collateral Estoppel

■ Glictronix seeks to preclude AT & T from relitigating numerous issues determined adversely to AT & T by the *Litton* jury and by the Second Circuit on AT & T's appeal. The doctrine of collateral estoppel provides that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent cases based on a different cause of action involving a party to the prior litigation." *Montana v. U.S.*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979).

Although Glictronix was not a party to the *Litton* case, all of the defendants here were. Glictronix moves to preclude relitigation of the *Litton* findings under the non-mutual, offensive application of the collateral estoppel doctrine set forth in *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

■ Before application of collateral estoppel can be deemed appropriate, the court must find that:

1. the party to be estopped must have been a party or in privity with a party to the prior action;

2. the issues to be estopped must be the same as the issues determined in the prior action;

3. the issues must have been actually litigated and necessary to the prior judgment; and

4. application of collateral estoppel will not be unfair because:

(a) the party to be estopped had little incentive to vigorously litigate the first action;

(b) the first judgment is inconsistent with other judgments on the issue to be estopped;

(c) the second action affords procedural opportunities unavailable in the first action

(or, more generally speaking, that the party to be estopped had a full and fair opportunity to litigate its claims in the first action); or

(d) application of collateral estopped would not otherwise be unfair to the defendant. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979).

AT & T contends that collateral estopped should not be applied because many of these criteria cannot be met.

### A. *Conditions Met.*

Defendant do not contest that several of the prerequisites for the application of collateral estopped have been met. The party against whom collateral estopped is asserted must have been a party or in privity with a party to the prior action. *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971). The defendants here were all parties to the *Litton* litigation.

Second, there must have been a final judgment on the merits on the issues to be collaterally estopped. *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). A final judgment on the merits was rendered by the *Litton* jury. That judgment was affirmed on appeal and defendants exhausted their right of appeal when the United States Supreme Court denied certiorari. *Litton Systems, Inc. v. America Tel. & Tel. Co.,* 76 Civ. 2512 (S.D.N.Y.1981), *aff'd,* 700 F.2d 785 (2d Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984).

Third, there is no question that AT & T vigorously litigated the *Litton* case. Beyond these points, each criterion for application of collateral estopped is contested.

### B. *Same or Different Issues*

To support application of collateral estoppel, the issues as to which a party seeks preclusion must be "identical" or "in substance the same" as the issues determined in the prior litigation. *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979); *Blonder-Tongue, supra,* 402 U.S. at 323, 91 S.Ct. at 1439.

Defendants contend that the issues here are different from those decided in *Litton* because the equipment at issue is not the same. The terms PBX and key system are generic and encompass a wide variety of equipment. Defendants contend that the *Litton* judgment is inapplicable to models of PBXs and key systems not at issue in *Litton.* The different models should be treated differently, the argument goes, because they have widely differing potentials for harming the network. Since the PCA is still required by the FCC for equipment which does not meet registration standards, defendant assert that it is important to distinguish among types of PBXs and key systems. Arguably, some equipment would have been required to use a PCA even if registration standards had been adopted much earlier than they were.

In support of their position, defendants rely on a recent decision in *Am/Comm Systems, Inc. v. American Tel. & Tel. Co.,* 101 F.R.D. 317 (E.D.Pa.1984), in which a motion to certify a nationwide class of distributors of telephone terminal equipment was denied. Regarding the question of whether class representatives' claims satisfied the Fed.R.Civ.P. 23(a)(3) requirement of typicality, the *Am/Comm* Court held that there had to be a "product-by-product" determination of whether the PCA requirement violated the antitrust laws. *Id.* at 321. Defendants interpret this holding to mean that a model by model analysis of the PBXs and key systems is required in this case and that application of collateral estoppel is inappropriate regarding any model which was not in issue in *Litton.*

Defendants' interpretation of *Am/Comm* in this context is incorrect. The *Am/Comm* plaintiffs defined the relevant product market to include many products in addition to PBXs and key systems, such as burglar alarms and automatic answering devices. (See Suppl. Appendix, Tab 8, ¶ 4(b)). In fact, in its brief opposing class certification

in *Am/Comm,* AT & T emphasized this difference between that case and Litton:

> The Litton case was limited to PBXs and Key Telephone Systems (700 F.2d at 801). Thus, *Litton* did not involve any of the types of equipment that are specifically identified in the Complaint in this case.

(See Plaintiff's Supplemental appendix regarding Class Cert., Vol II Tab 9 at 21).

Given these facts, it is evident why the *Am/Comm* court held that product-by-product analysis was required; the products at issue were wholly different from the PBXs and key systems at issue in *Litton.* Here AT & T can only contend that different models of PBXs and key systems are involved.

In *Litton,* PBXs and key systems were treated generically. There was no attempt to limit the case to particular models or manufacturers. The relevant product market was "the sale and lease of PBX's and key systems". *See Phonetele, Inc. v. American Telephone & Telegraph Co.,* No. CV–74–3566–MML (C.D.Cal., January 19, 1984).

In this case, unlike in *Am/Comm,* the relevant market is limited to PBXs and key systems. Since the relevant product market in *Litton* covered all such equipment, the PBXs and key systems at issue here must necessarily have been the subject of the findings in *Litton.*

As AT & T points out, the FCC's registration orders recognized that different equipment may have different potential for harm to the system. Despite this theoretical possibility, the Second circuit in *Litton* found as a general matter that "the jury could have reasonably concluded ... that AT & T's ongoing claim of harm to the system was baseless." *Litton, supra,* 700 F.2d at 811. Since this determination appears clearly to address the entire product market, there is no basis to require that a new determination be made regarding the specific equipment in this case.

**3.** The third issue on which the jury failed to reach unanimity was the question of whether

## C. *Actually Litigated and Necessary*

In order to apply collateral estoppel, the issues to be precluded must have been "actually litigated and necessary to the outcome of the first action." *Parklane, supra,* 439 U.S. at 326, 99 S.Ct. at 649, n. 5. AT & T contends that the *Litton* jury's "belated" finding that the filing of the interface device tariff was in bad faith was not necessary to the outcome of *Litton* and should therefore not be given preclusive effect here.

As was discussed by the Second Circuit in *Litton,* when the *Litton* jury returned its verdict finding AT & T guilty of monopolization, it had failed to reach unanimity on three matters, including special interrogatory 16(a), which asked whether the filing of the interface tariff was in bad faith. Special interrogatory 16 listed nine alleged practices of the defendants and asked the jury on which of the practices it had based its finding of predatory conduct. The jury answered in the affirmative with respect to three of the listed practices: 16–b, "intentional delay in providing and installing interface devices"; 16–c, "opposing certification in bad faith"; and 16–h, "bad faith refusal to sell inside wiring at all or on a reasonable basis." The jury reported it was divided regarding 16–a, "filing of the interface device tariff in bad faith" and 16–i, "bad faith delay in making customers." [3]

After this initial verdict, counsel and the court discussed whether the jury should be asked to deliberate further on the undecided questions. AT & T's counsel argued against further deliberations saying that the absence of unanimity on 16–a and 16–i "doesn't interfere in of itself with the damage award ..." (Plaintiff's Appendix to CE Brief, A6390). The court expressed the opinion that the damage award could be supported by the answer to 16–c. (*Id.* at A6394).

Over defendant's objections, the judge instructed the jury to try to answer the

AT & Ts attempted monopolization was the proximate cause of plaintiffs' injury.

questions "if you can possibly agree after discussing the matter again ... to see whether or not you can't in good conscience adopt [the views of other jurors] as your own". *Litton, supra,* 700 F.2d at 804, n. 24. (brackets in original). The jury returned after approximately a half hour's deliberation, having found against AT & T on all three issues. The jury did not change the amount of damages it had already assessed. *Id.* at n. 25.

AT & T argues that because the answer to Special Interrogatory 16(a) came after the determination of damages, the jury did not reach its verdict in reliance on its finding that the tariffs were filed in bad faith and therefore that finding was not essential to the judgment. AT & T also notes that the Second Circuit has stated that the verdict on the monopoly charge and the damage award could be sustained without the three belated findings. *Litton, supra,* 700 F.2d at 803.

In *Phonetele, Inc. v. American Tel. & Tel. Co., supra,* the court considered and rejected plaintiffs' motion for application of collateral estoppel based on the *Litton* findings. As Glictronix contends, the holding of the *Phonetele* opinion appears to be that collateral estoppel could not be applied because the product and market at issue were entirely different from the products and market in *Litton.* The product at issue in *Phonetele* was the "Phonemaster", a product against which AT & T did not compete since it had no comparable product. (Slip op. at 7, 8).

However, after pointing out this difference in product markets, the *Phonetele* court considered the significance for collateral estoppel purposes of the belated findings. It stated that:

Inasmuch as the Court of Appeals then determined that the initial three findings were adequately supported, 700 F.2d at 814–15, it is clearly arguable that the answer to question 16(a) was not necessary. In view of the potentially broad impact of the issue in this case, the Court concludes that its preclusion here on du-

bious grounds would not be appropriate. (Slip op. at 9).

In *Selectron, Inc. v. American Tel. & Tel. Co.,* 587 F.Supp. 856 (D.Ore.1984), the court concluded that "it is a well recognized rule that an alternative ground upon which a decision is based should be regarded as necessary for purposes of determining whether [a party] is precluded by the principles of *res judicata* or collateral estoppel from relitigating in a subsequent lawsuit any of those alternative grounds. *Winters v. Lavine,* 574 F.2d 46, 67 (2d Cir.1978)." Id., at 862–863.

The clear majority view is that a judgment is conclusive as to all issues that support all independent grounds on which the judgment may be based. 1B J Moore ¶ 0.443[5.–2]; Restatement (Second of Judgments, § 27 comment 0 (1982); *Winters v. Lavine,* 574 F.2d 46, 66–69 (2d Cir. 1978); *Williams v. Ward,* 556 F.2d 1143, 154 (2d Cir.1977); *but see Halpern v. Schwartz,* 426 F.2d 102, 105–08 (2d Cir. 1970); *District of Columbus v. C.F. & B., Inc.,* 442 F.Supp. 251 (D.D.C.1977).

In *Halpern,* a case subsequently limited to its facts by *Winters* and *Williams,* the court identified two considerations against giving collateral estoppel effect to all alternative grounds of a judgment. First, the court was concerned that if the jury or court in the prior case were sure of one ground, it might not give rigorous consideration to the other. Second, it suggested that a losing litigant might not vigorously appeal an erroneous ruling on one alternative ground if it believed the judgment would be affirmed on another ground. *Halpern v. Schwartz, supra,* 426 F.2d at 105.

AT & T implies that because the jury had already found liability, it may not have given rigorous consideration to interrogatory 16–a. The speed with which the jury decided the question and the fact that the damage award remained unchanged allegedly support this conclusion.

█ In appealing the jury verdict, AT & T argued that the 16–a finding should have

been set aside because it had been coerced or was otherwise tainted. The Second Circuit rejected this contention, pointing to evidence that the jury had deliberated conscientiously and had been impartial. *Litton, supra,* 700 F.2d at 803. Specifically, the court believed the jury was not unfairly disposed to make findings favorable to one side or the other since it had found liability on one count, no liability on two others, and reached no agreement on another. The court ruled that "Litton was entitled to a jury determination on all its claims." *Id.* at 804. Apparently the Second Circuit, which had the opportunity to review the entire record, found that there was no reason to believe that the jury had not given fair consideration to interrogatory 16–a. There is no reason to think that the jury's belated findings were coerced or tainted. The fact that the jury added no damages after answering 16–a does not undermine the necessity of the finding or suggest that the jury did not consider it rigorously. The jury had already found AT & T had opposed certification in bad faith. It is entirely plausible that the jury believed that the finding of bad faith in filing the tariff did not cause damages additional to those caused by the bad faith opposition to certification.

Finally, it is mere speculation to conclude that the speed of the jury's decision indicated that it did not give due consideration to the interrogatory. Having observed the lengthy trial and having previously deliberated their verdict, the jury may well have been able take the needed steps to reach its decision in half an hour with due consideration of the issue.

The second *Halpern* consideration is inapplicable to this case. Not only did AT & T have sufficient motive to appeal the jury's belated findings, but it did appeal them. It is obvious from the Second Circuit's opinion that AT & T vigorously challenged the findings and that the court thoroughly considered its arguments. *Litton, supra,* 700 F.2d at 802–04, 810–12.

 It is unquestionably true that the jury verdict could have stood absent the interrogatory 16–a findings. But under the prevailing view, the existence of multiple independent grounds for a judgment does not justify the conclusion that any of those grounds are unnecessary for collateral estoppel purposes. This case does not fit into the *Halpern* exception, even if the Third Circuit recognizes that exception. For these reasons, I conclude that the belated jury findings are to be deemed "necessary" for collateral estoppel purposes. *But see Wrede v. AT & T,* Civ. No. 83–283–1, slip op. at 9–10 (M.D.Ga. May 28, 1984); *Phonetele v. AT & T,* Civ. No. 74–3566, slip op. at 8–9 (C.D.Cal. January 19, 1984).

### D. *Unfairness to AT & T*

In *Parklane Hosiery Co. v. Shore, supra,* 439 U.S. at 330–31, 99 S.Ct. at 651–52, the Supreme Court listed three situations in which it may be unfair to the defendant to apply offensive, non-mutual collateral estoppel:

> If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable. The *Evergreens v. Nunan,* 141 F.2d 927, 929 (CA2); *cf. Berner v. British Commonwealth Pac. Airlines,* 346 F.2d 532 (CA2 [d Cir.1965] ) (application of offensive collateral estoppel denied where defendant did not appeal an adverse judgment awarding damages of $35,000 and defendant was later sued for over $7 million). Allowing offensive collateral estoppel may also be unfair to a defendant if the judgment relied upon as a basis for the estoppel is itself inconsistent with one or more previous judgments in favor of the defendant. Still another situation where it might be unfair to apply offensive estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.

AT & T contends that it should not be estopped from relitigating the *Litton* judgment for the latter two reasons.

### 1. Inconsistent Judgments.

AT & T contends that various portions of the *Litton* judgment are inconsistent with an opinion in *United States v. American Tel & Tel. Co.*, 524 F.Supp. 1336 (D.D.C. 1981), rulings of the FCC and state regulatory agencies, and a National Academy of Sciences report. *Parklane Hosiery, supra*, explicitly states that previous, inconsistent judgments may bar application of collateral estoppel; nowhere does the opinion suggest that inconsistent determinations other than final judgments may act as a bar. *See. also Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 346 (3d Cir. 1982); but see a contrary analysis by the Court of Appeals in *Faucett, supra*, at 129–130.

### a. Administrative and Other Determinations

However, AT & T contends that the preclusive effect of a final judgment may be blocked by the existence of administrative agency determinations which are inconsistent with that judgment. In support of this contention, AT & T offers two arguments. First, it argues that the fact that these rulings were not final judgments is not controlling because the doctrine of collateral estoppel is premised on an "underlying confidence" in the correctness of the judgment relied on, and therefore the fact that inconsistent determinations exist is more important than their form.

Second, AT & T suggests that since administrative agency findings may themselves have collateral estoppel effect in some circumstances, they must also carry enough weight to bar the preclusive effect of a judgment with which they are inconsistent.

Regarding AT & T's first point, it is true that collateral estoppel is premised on an underlying confidence in the judgment relied on. *Standefer v. U.S.*, 447 U.S. 10, 23 n. 18, 100 S.Ct. 1999, 2007 n. 18, 64 L.Ed.2d 689 (1980). As will be discussed later, the administrative rulings which AT & T cites are not inconsistent with *Litton*. However, for the purposes of the "inconsistent judgment" consideration, the form of the prior determination is significant.

To illustrate the potential unfairness to defendants which the "inconsistent judgment" criterion is designed to prevent, the Supreme Court in *Parklane* cited a hypothetical case presented by Professor Currie. *Parklane, supra*, 439 U.S. at 330 n. 14, 99 S.Ct. at 651 n. 14. In his hypothetical, Currie posited a railroad collision which injures 50 passengers, each of whom brings individual suit against the railroad. Currie argues, and the Court implicitly agreed, that if the railroad won the first 25 suits and lost the 26th, plaintiffs in cases 27 through 50 should not be able to apply case 26 offensively against the railroad.

This example aptly illustrates the purpose of the "inconsistent judgment" consideration, and suggests that the form of the prior determination is important. When courts in earlier cases have fully litigated an issue and reached inconsistent final judgments, there is good reason not to give preclusive effect to either judgment. The mere fact of the inconsistent judgments suggests that even after full consideration of the issue between adversary parties there remains ground on which a reasonable jury or court may differ.

■ But where a determination is reached by an administrative agency, without the benefit of a full adversary process, there is no reason to bar the preclusive effect of a later final judgment reached in a fully litigated adjudication simply because it is inconsistent with the agency determination.

■ The cases cited by AT & T in support of its argument that the administrative agency determinations are "inconsistent judgments" are unpersuasive. In *Nasem v. Brown*, 595 F.2d 801, 806 (D.C.Cir. 1979), the court treated as "well established" the "proposition that administrative proceedings may collaterally estop relitigation in the court." However, it went on to say that such proceedings have preclusive effect when "an administrative agency is acting in a judicial capacity and resolves

disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate." *Id.* quoting *U.S. v. Utah Construction & Mining Co.* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966).[4] In this case, the administrative determinations are not adjudications between parties which can be relied on for collateral estoppel.[5] They are not the product of proceedings in which adverse parties presented conflicting evidence on the issues presented in this case. These administrative determinations did not afford the parties here an adequate opportunity to litigate the questions at issue in this case, and therefore should not be used to block the preclusive effect of *Litton,* in which these issues were fully litigated.

For similar reasons, it is obvious that the report of the NAS is not a judgment inconsistent with *Litton.*

b. *United States v. AT & T* and the *Noerr-Pennington* Doctrine.

AT & T contends that the *Litton* court's determinations (1) that the *Noerr-Pennington* Doctrine does not apply to AT & T's opposition to certification before the FCC, and (2) that the opposition to certification constituted a sham under the "sham exception" to the *Noerr-Pennington* Doctrine both conflict with determinations of Judge Greene in *United States v. American Tel. & Tel. Co.,* 524 F.Supp. 1336 (D.D.C.1981).

One part of the government's case against AT & T involved the claim that AT & T's post-*Carterfone* policies on interconnection of customer-provided terminal equipment violated the antitrust laws. The government's proof in this area consisted of a series of "episodes", each describing the experience with the PCA requirements of individual companies which marketed terminal equipment. One of these episodes involved Litton's experience marketing PBXs. *United States v. AT & T, supra,*

524 F.Supp. at 1349 & n. 40. In an earlier opinion, Judge Greene ordered that the government have access to the document discovery which had been undertaken in *Litton* because he considered the claims and issues in *Litton* to "represent a separate and identifiable segment of the government's case here." *United States v. AT & T,* 461 F.Supp. 1314, 1340–41 (D.D.C. 1978).

Following the presentation of the government's case, AT & T moved to dismiss. Under the heading "Interconnection of Customer-Provided Terminal Equipment," Judge Greene reviewed the government's evidence regarding the PCA requirement:

The testimony and exhibits presented in support of the government's contentions in these episodes tended to show that the PCA requirement was unnecessary; that the PCAs imposed by Bell were overly engineered and that their cost, when added to that of the terminal equipment itself, either foreclosed non-Bell manufacturers from the particular equipment market or made it difficult for them to compete with Western Electric; that PCAs were often unavailable, that their delivery was sometimes substantially delayed, or that they were incompatible with non-Bell equipment; and that the stated need for the PCA and the defects of some PCAs caused customers to fear that, unlike Western Electric products, non-Bell equipment was unsafe and unreliable.

The eleventh episode is the "umbrella" package, concerning more generally Bell practices and policies with regard to the interconnection of customer-provided terminal equipment. The evidence presented in conjunction with this episode tended to show the following.

As of 1968, the time of the Carterfone decision, defendants had considered at least two options to protect the network

---

**4.** *Utah Construction* is the only other case cited by AT & T to support its argument that administrative determinations are inconsistent judgments.

**5.** The FCC rulings, for example, were not the result of litigation between adversarial parties after full discovery. The purpose and methods of the proceedings are wholly dissimilar to those of the *Litton* litigation.

from harm by customer-provided equipment: the PCA requirement and a certification program. A certification program—that is, a means by which non-Bell equipment would be permitted to be connected to the network after it had been certified to meet certain technical standards—would have obviated the need for the PCAs, with their costs, problems, and drawbacks, and it would thus have been consistent with the FCC's Carterfone mandate to liberalize interconnection policy. Nevertheless, defendants decided to implement a PCA tariff rather than the certification option.

The government's evidence further tended to show that, during the five-year period after 1968, defendants concluded that the implementation of some kind of certification program was feasible, but they nevertheless decided to oppose any liberalization of their interconnection policy (whether by certification or otherwise) out of concern over the effect on their revenues and market position. Defendants were at that time all aware of (and they encouraged) the barrier to competition created by the unavailability and inadequate maintenance of the PCAs as well as of the additional economic barrier these devices created because of their added cost. The government's proof further indicated that defendants were unable ever to find empirical support for the proposition that the PCA policy was necessary to prevent actual harm to the telecommunications network.

Finally, the evidence showed that, at approximately the same time that the FCC initiated its own certification docket on June 14, 1972, Bell decided to continue to withhold support from any effort to establish a certification program in order to "buy time" for internal restructuring so as to enable it to prosper in a competitive market.

*United States v. AT & T, supra,* 524 F.Supp. at 1349–50. The court concluded that "by and large, the evidence addressed sustained the government's charges." *Id.* at 1350–51.

Thus, the factual findings of Judge Greene are not inconsistent with *Litton* on the claims of "anticompetitive or predatory conduct" and many other of the *Litton* findings for which Glictronix seeks collateral estoppel here.

■ However, Judge Greene went on to consider the legal question of whether AT & T's opposition to certification fell within the protection of the *Noerr-Pennington* doctrine. The doctrine holds that "the Sherman Act .... does not apply to ... activities compris[ing] mere solicitation of governmental action with respect to the passage and enforcement of laws ..." *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 138, 81 S.Ct. 523, 530, 5 L.Ed.2d 464 (1961). "*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose ... Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition". *United Mine Workers v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965). The *Noerr-Pennington* doctrine applies to administrative proceedings. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 510–11, 92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972).

Although his factual findings were consistent with the conclusion that AT & T opposed certification in bad faith, Judge Greene held that AT & T's opposition to certification in proceedings before the FCC constituted "petitioning" activities which were entitled to *Noerr-Pennington* protection. *United States v. AT & T, supra,* 524 F.Supp. at 1350 n. 54 ("since this proof [of AT & T's opposition to certification] directly concerns the positions taken by defendants before the FCC, the court may not rely on it as a basis for antitrust liability.") and at 1363 and n. 110.

■ This legal conclusion conflicts with the holding of the *Litton* court that the opposition to certification was not petitioning activity and did not fall within the *Noerr-Pennington* doctrine. *Litton, supra,* 700 F.2d at 809. Both Judge Greene

and the *Litton* court agreed that AT & T's filing of the PCA tariff constituted a private commercial action, and not advocacy before the FCC which would warrant *Noerr-Pennington* protection. *Litton, supra*, 700 F.2d at 807 and n. 32; *United States v. AT & T, supra*, 524 F.Supp. at 1350 & n. 47.[6] However, unlike Judge Greene, the *Litton* court held that opposition to certification, like the filing of the tariff, was not entitled to *Noerr-Pennington* protection. The court rejected AT & T's argument that its opposition "amounted to no more than espousing a position before an administrative body." *Litton, supra*, 700 F.2d at 809. Its reasoning appears to have been that the opposition was merely a bad faith effort to maintain the tariff and was therefore not entitled to any more protection than was the act of filing the tariff. The court stated:

> Much of our analysis relating to the filing of the interface tariff applies to AT & T's opposition to certification. Opposition to certification is simply the other side of the interface tariff coin; AT & T's filing and maintenance of the PCA requirement was the very embodiment of opposition to the only feasible alternative—certification standards.

*Litton, supra*, 700 F.2d at 809.

Glictronix seeks a ruling, based on *Litton*, that the defense of the *Noerr-Pennington* doctrine is inapplicable to the anticompetitive or predatory conduct alleged in this case. Regarding the applicability of *Noerr-Pennington* to the opposition to certification, Judge Greene's opinion constitutes a judgment inconsistent with the *Litton* judgment. Collateral estoppel cannot be applied to foreclose the question of whether the opposition to certification may be entitled to *Noerr-Pennington* protection.

■ A second reason exists for this conclusion. As a general matter, collateral estoppel may apply to questions of law. IB J. Moore ¶ 0.448 at 840. However, this rule

is subject to broad qualifications. Restatement (second) of Judgments § 29(7) states that the offensive use of collateral estoppel is inappropriate where "[t]he issue is one of law and treating it as conclusively determined would inappropriately foreclose opportunity for obtaining reconsideration of the legal rule on which it was based." Elaborating on this provision, Comment i to § 29(7) states, "[t]his consideration is especially pertinent when there is a difference in the forums in which the two actions are to be determined...."

There is considerable question whether the *Litton* court's ruling that the opposition to certification is not entitled to *Noerr-Pennington* protection is correct. Judge Greene's opinion conflicts directly with the *Litton* court on this point. Numerous other cases also suggest that many courts would consider opposition to certification to be a protected effort to influence government action. *See e.g., Mid-Texas Communication Systems, Inc. v. American Tel & Tel. Co.*, 615 F.2d 1372, 1384 and n. 10 (5th Cir.), *cert. denied*, 449 U.S. 912, 101 S.Ct. 286, 66 L.Ed.2d 140 (1980). In *Phonetele, Inc. v. AT & T, supra*, slip op. at 10, on precisely the question at issue here, the court stated:

> Because this Court entertains doubt about the correctness of the *Litton Systems* decision on the applicability of the [*Noerr-Pennington*] doctrine to the opposition to certification, *see, Clipper Express v. Rocky Mountain Motor Tariff Bureau*, 674 F.2d 1252, 1262–63 (9th Cir. 1982), the Court declines to apply issue preclusion with respect to that point.

The effect of applying the Second Circuit's ruling in *Litton* that the opposition to certification is not entitled to *Noerr-Pennington* protection would be to foreclose the Third Circuit from independently considering this legal question. In view of the fact that the *Litton* court's holding appears to be at odds with the positions of other circuits, it would be inappropriate to

---

**6.** It is therefore clear that nothing in Judge Greene's opinion is inconsistent with *Litton's* findings that AT & T filed the PCA tariff in bad faith and that the *Noerr-Pennington* doctrine does not protect this conduct.

bind this court to the *Litton* court's holding. Restatement (second) judgments § 29(7) and comments: *Phonetel, Inc. v. AT & T, supra.*

After determining that AT & T's opposition to certification fell within the *Noerr-Pennington* doctrine, Judge Greene addressed the question of whether that conduct might still be a basis for anti-trust liability under the "sham" exception to the *Noerr-Pennington* doctrine. Under the "sham" exception, petitioning activities which would normally be protected can be the basis for liability when:

> The defendant's activity was intended to injure the plaintiff directly rather than through a government decision. When the antitrust defendant had not truly sought to influence the governmental decision, his invocation of governmental machinery is a sham ... [W]here he had no reasonable expectation of obtaining the favorable ruling, his effort to do so was a sham.

*Litton, supra,* 700 F.2d at 810, quoting P. Areeda, Antitrust Law ¶ 203.1a (Supp. 1982).

As argued by Litton in its opposition to AT & T's petition for certiorari in the Supreme Court, Judge Greene's formulation of the standards for the sham exception are consistent with those of the *Litton* court. As part of his discussion, Judge Greene noted that "the sham exception is not satisfied by a mere showing of anticompetitive intent ...; there must be proof that those being charged subverted the integrity of the governmental process .." or that "the relevant activities were intended not to secure governmental action but to harm others through deliberate abuse of the governmental process." *United States v. AT & T, supra,* 524 F.Supp. at 1362.

Having agreed on the standards, Judge Greene and the *Litton* court reached conflicting conclusions as to whether AT & T's opposition to certification fit the sham exception. Viewing the evidence in the light most favorable to Litton, as it was obliged to do in reviewing the jury's verdict, the *Litton* court determined that the sham exception applied to AT & T's conduct, which it said "was not undertaken in the hope of influencing governmental action, but in the hope of delaying it." *Litton,* supra, 700 F.2d at 812. The court based its decision or its belief that:

> AT & T had no realistic hope that the FCC would approve the interface device; its own people thought that the device was a redundant "artificial barrier" to competition. It nevertheless consciously pursued a policy of delaying the time when the FCC would strike down the PCA requirement. It implemented this policy by making baseless claims relative to potential harms to the network while opposing certification standards in every way possible.

*Id.* at 811.

Judge Greene did not specifically address the application of the sham exception to AT & T's opposition to certification before the FCC. But with only a single exception, irrelevant to this case, he generally determined that "the evidence shows little more than that Bell opposed new cutouts, that it made contentions which were not wholly correct, and that the FCC ultimately ruled against Bell." *United States v. AT & T, supra,* 524 F.Supp. at 1361–64. He held that such conduct did not fit the sham exception and ordered the government's contentions regarding AT & T's representations to the FCC be stricken. *Id.* at 1363–64, 1381.

The two opinions appear to be in direct conflict. While both seem to agree that AT & T acted with at least some degree of bad faith, Judge Greene concluded that AT & T's conduct did not amount to a subversion of the administrative process, while the *Litton* court concluded that it did.

Glictronix argues that the two decisions are not inconsistent, but merely reflect rulings based on differing factual records. It is true that the two courts agreed on the applicable legal standard and on many of

their factual findings. Glictronix suggests that if Judge Greene had had before him the full body of evidence on which the *Litton* jury relied, he too would have found AT & T's petitioning activities a sham. To this effect, Glictronix cites Litton's opposition to AT & T's petition for certiorari to the Supreme Court, which lists the *Litton* witnesses who did not testify in the government's case. (Plaintiffs' Reply Brief on Partial Summary Judgment, Ex. B p. 27 n. 18)

However, Glictronix offers no explanation of what facts emerged in the *Litton* litigation that were unavailable to Judge Greene. As noted earlier, Judge Greene ordered the discovery in *Litton* be made available to the government. His discussion of the evidence demonstrates that he had much of the same evidence before him as did the *Litton* court. *United States v. AT & T, supra,* 524 F.Supp. at 1348–50. Glictronix has not shown that Judge Greene had an incomplete record before him. *Compare Carr v. District of Columbia,* 646 F.2d 599, 606 (D.C.Cir.1980).

In considering the same issue, the *Selectron* court held that Judge Greene's ruling was based on an incomplete record. *Selectron v. AT & T,* 587 F.Supp. 856, 866 (D.Ore.1984). The sole example of evidence missing from the record before Judge Greene cited by the *Selectron* court was "testimony of the Chairman of the PBX Advisory Committee indicating intentional delay in the development of a certification program." *Id.* at n. 21. The opinion contains no elaboration of what this testimony was. I do not find the absence of this evidence alone to be significant enough to permit a conclusion that the judgments in the government's case and in *Litton* are not inconsistent.

Glictronix has not submitted any concrete explanation for the differing outcomes which would justify the conclusion that the two opinions are not inconsistent. In the absence of an adequate explanation, I cannot apply the *Litton* court's ruling that AT & T's opposition to certification

before the FCC is not entitled to *Noerr-Pennington* protection under the sham exception.

Similarly, I must reject the *Selectron* court's conclusion, urged by Glictronix here, that Judge Greene's opinion does not constitute a "final judgment" for collateral estoppel purposes. In ordering the government's contentions regarding AT & T's petitioning activities be stricken, Judge Greene granted a part of AT & T's motion to dismiss. Numerous courts give collateral estoppel effect to such partial grants of motions to dismiss or for summary judgment. See 1B of Moore ¶ 0.441[4] at 744–47; Restatement (second) of Judgments § 13.

In concluding that Judge Greene's ruling was not a final judgment, the *Selectron* court notes that the filing was made on a mid-trial motion to dismiss under Fed.R. Civ.P. 41(b). Judge Greene stated in his opinion that:

> The decision on the motion to dismiss is a "tentative and inconclusive ruling on the quontium of plaintiff's proof," which does not preclude a court from making finding and conclusions at the close of the case that are inconsistent with its prior tentative ruling.

*United States v. AT & T,* 524 F.Supp. at 1343. Since Judge Greene himself characterized his decision as tentative, the *Selectron* court reasons, it cannot be considered a final judgment.

■ Whether a judgment should be considered final for the purposes of collateral estoppel "turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review." *Lummus Co. v. Commonwealth Refining Co.,* 297 F.2d 80, 89 (2d Cir.1961), *cert. denied,* 368 U.S. 986, 82 S.Ct. 601, 7 L.Ed.2d 524 (1962); *Aiello v. City of Wilmington,* 470 F.Supp. 414, 419 (D.Del.1979) *(quoting Lummus ).*

■ Notwithstanding his prefatory comments, Judge Greene's decision clearly appears to dispose of the government's contentions regarding AT & T petitioning activities. There is no doubt that the hearing was adequate, and the judge rendered a lengthy opinion which addressed the issue. More importantly, the judge in fact reached definite rather than tentative conclusions. He did not merely suggest tentatively that the government's contentions regarding AT & T's representations before the FCC would not prevail; he struck those contentions. *United States v. AT & T, supra,* 524 F.Supp. at 1381.

If Judge Greene's opinion was in any sense tentative, it was regarding rulings adverse to AT & T. The government had already put on its case, and Judge Greene was in a position to make a final ruling that the government had failed to make its case on the issue of AT & T's opposition to certification. The *Noerr-Pennington* rulings in *United States v. AT & T* are final judgments for the purpose of collateral estoppel. They therefore constitute cognizable inconsistent judgments preventing the application of collateral estoppel to the *Litton* holdings regarding the *Noerr-Pennington* protection owed to AT & T's petitioning activities.

### 2. Full and Fair Opportunity to Litigate.

■ Offensive collateral estoppel will not be applied "where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result." *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 330–31, 99 S.Ct. 645, 651–52, 58 L.Ed.2d 552 (1979), stated generally, collateral estoppel cannot apply against a party who in the earlier case did not have a full and fair opportunity to litigate the issue to be precluded. *Id.* at 332–33, 99 S.Ct. at 652–53; *Allen v. McCurry,* 449 U.S. 90, 95, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980).

AT & T offers several reasons for its contention that it did not have a fair opportunity to litigate the PCA/certification issues in Litton.

First, AT & T contends the trial court in *Litton* excluded critical evidence offered by AT & T concerning the reasonableness of its conduct. Specifically, AT & T alleges that the trial court wrongly excluded a 1969 New York Public Service Commission decision holding that "retention of control by the telephone company of network control signaling ... is absolutely necessary to insure reliable service to the public." *Re New York Telephone Co.,* 79 P.U.R.3d 410, 417 (1969). Although AT & T implies that evidence of a number of state regulatory agencies' policies was excluded, AT & T only attempted to introduce evidence of this one decision. (Plaintiffs' response to and analysis of Defendants' Documentary Submission, p. 15).

The trial judge excluded this decision on the ground that its likelihood of misleading the jury outweighed its probative value (Plaintiff's Response to and Analysis of Defendant's Documentary Submission, Ex. C, Tr. 11397). At issue before the New York Commission was a tariff requiring a $20 installation of a "voice coupler" carrying a 50¢ monthly fee. The judge determined that the tariff was too dissimilar to the PCA tariff, which carried a monthly charge of at least $6.50, to be probative of the issues in the case. In reviewing this evidentiary ruling, the Second Circuit concluded that the New York Commission's decision was "arguably probative of AT & T's position" and found it "difficult to justify the exclusion of this decision in the light of the admission" of the various FCC rulings. *Litton, supra,* 700 F.2d at 819. The court stated that the difference in costs between the two tariffs went more to the question of the weight to be given the evidence, rather than to its admissibility. However, recognizing the complicated and extensive nature of the trial and the trial court's need to limit the evidence at some point, the Court found that the exclusion of the decision did not amount to prejudicial error. *Id.*

AT & T argues that because this allegedly "crucial" evidence was excluded, the *Litton* judgment should not be given preclusive effect. AT & T implicitly argues that the excluded evidence should be treated as would newly discovered evidence. At least according to one view, "newly discovered evidence, even if insufficient to justify setting aside a judgment, may warrant refusal to give the [prior] judgment preclusive effect in other actions." See *Carr v. District of Columbia,* 646 F.2d 599, 606 n. 35; Restatement (second) Judgments § 29 Comment j (1980). Assuming that this view is correct and that it applies to wrongly excluded evidence, AT & T argues that the Second Circuit's refusal to set aside the judgment despite the trial court's incorrect evidentiary ruling should not prevent this court from refusing to give the *Litton* judgment preclusive effect.

In *Blonder-Tongue Labs. v. University Foundation,* 402 U.S. 313, 333, 91 S.Ct. 1434, 1445, 28 L.Ed.2d 788 (1971), the Supreme Court stated that the question of whether a party, without fault of his own, "was deprived of crucial evidence or witnesses in the first litigation" was relevant to a determination of whether that party had had a full and fair opportunity to litigate. The Court went on to say that:

> No one set of facts, no one collection of words or phrases will provide an automatic formula for proper rulings on estoppel pleas. In the end, decision will necessarily rest on the trial courts' sense of justice and equity.

Id. at 333–34, 91 S.Ct. at 1445.

█ Assuming *arguendo* that the showing a party must make to avoid collateral estoppel is less than that required to obtain a new trial because of newly discovered evidence, the district court in *Faucett* held that the party "must nevertheless proffer evidence which is not only relevant to the issues as to which they seek to avoid preclusion, but is also more than conjecturally likely to make a difference in the outcome." *Faucett, supra,* 566 F.Supp. at 300. The Court of Appeals disagreed, holding that:

We are persuaded by AT & T's argument that the existence of this acknowledged error in the presentation of the case to the *Litton* jury is a serious obstacle to the plaintiff's use of offensive estoppel on the issue of AT & T's liability. While, standing by itself, such error might not tip the scale against such estoppel, when added to the other factors discussed below, the application of offensive estoppel in this case would be unfair.

At 128. The reasoning of the Court of Appeals in *Faucett* is persuasive and I will adopt it on this aspect of the collateral estoppel question.

AT & T's second argument concerning a full and fair opportunity, is that it has newly discovered evidence which will demonstrate that its conduct was reasonable. In support of this proposition, AT & T submitted 11 volumes of documents which it claims establish:

(1) that the post-*Carterfone* tariffs were filed in 1968 in good faith pursuant to a decision made by H.I. Romnes, then Chairman of the Board of AT & T;

(2) that John deButts' decision in 1973 to oppose certification was not made for the purpose of delay but, instead, was based upon Mr. deButts' good faith belief that certification would result in technical harm to the public switched network, and, even more importantly, would have adverse economic consequences upon ordinary users of the telephone in the form of higher telephone rates, thus threatening the principle of universal service;

(3) that AT & T's opposition to certification did not in fact delay the Commission's proceedings in the Registration docket;

(4) that any delay in that docket resulted from the strong political opposition to certification generated by state regulatory commissioners who took the same position as Mr. deButts with respect to the adverse economic consequences of certification;

(5) that the Commission ultimately adopted a certification program for PBXs and key telephone systems only because it believed, first, that there would be no sub-

stantial adverse economic impact from certification, and second, that if some such impact did occur, the feared effect upon the ordinary telephone user could be avoided through changes in the separations formula;

(6) that the decisions of the Commission, which reflected Commission adoption—virtually without change—of the recommendations made by its staff under the supervision of the newly-appointed Chief of the Common Carrier Bureau, distorted many of these facts and contained language deliberately inserted to create a basis for antitrust litigation against AT & T; and

(7) that events subsequent to the completion of the *Litton* trial demonstrate that the FCC was wrong and, hence, that the state regulatory commissioners and Mr. deButts were right on the critical economic issues surrounding certification.

Glictronix convincingly argues that most of the documents AT & T has submitted are either not newly discovered, would be inadmissible, refer only to collateral issues or are cumulative of evidence which was admitted. (See Plaintiff's Response to Defendants' Documentary Submission).

In its document-by-document response, Glictronix establishes that most of this "newly discovered evidence" was available to AT & T at the *Litton* trial, but that AT & T simply decided as a matter of trial strategy not to use it. Since the absence of this evidence in *Litton* was AT & T's own fault, it cannot claim unfairness here. *Blonder-Tongue, supra*, 402 U.S. at 333, 91 S.Ct. at 1445.

AT & T has submitted here the testimony of various individual FCC officials. AT & T could have offered their testimony in *Litton* and did not. Moreover, testimony giving a personal interpretation of the meaning of FCC decisions probably would be inadmissible. *United States v. AT & T*, 524 F.Supp. 1381, 1387 (D.D.C.1981).

Several documents were apparently newly discovered by AT & T. One was a "Report to the Chairman of Critical Projects," which AT & T claims establishes

that AT & T caused no delay in the adoption of a registration program. (defendants' Vol. Xc. Tab 9 and Summary of Documentary Submission, p. 68.) Suffice it to say, the documents do not in any way establish that AT & T was not responsible for at least some delay in the changeover from the blanket PCA requirement to certification standards. (See *Id.* at pp 7 and 9 and Plaintiffs' Response to and Analysis of Defendants' Documentary Submission, p. 36–37).

Much of the allegedly new evidence involves Walter Hinchman, who became chief of the FCC's Common Carrier Bureau in 1974. Hinchman testified in *Southern Pacific Comm. Co. v. American Tel. & Tel. Co., ("SPCC")*, 556 F.Supp. 825 (D.D.C. 1983), on issues other than those involved in this case. In that case, Judge Richey stated:

The inference is justified that under the direction of Mr. Hinchman, whom the Court found to be lacking in candor and trustworthiness, the staff launched into a program to protect the specialized carriers from competition from AT & T and to create FCC findings that could be utilized as predicates in antitrust actions against the Bell System.

*SPCC, supra,* 556 F.Supp. at 1056–57.

The FCC rulings that the interface tariff was "unnecessarily restrictive" and an "unjust and unreasonable discrimination" were written by Mr. Hinchman or his staff. (Defendants' Documentary Submission, p. 59–60). The *Litton* court stated unequivocally that these FCC "decisions were central both to Litton's claim that the PCA device was unnecessary and Litton's rebuttal of AT & T's defense that the interface tariff was an attempt to comply with previous FCC rulings." *Litton, supra,* 700 F.2d at 818. AT & T argues that *Litton* should not be collaterally applied because of this newly found evidence that the FCC decisions on which the jury relied may be untrustworthy.

Glictronix responds that Hinchman himself did not testify on the reasonableness of the PCA tariff in *Litton,* and that Hinch-

man's trustworthiness is irrelevant to whether *Litton* should be collaterally applied. These arguments miss the point. The issue is the trustworthiness of the FCC decisions he and his staff authored. More relevant is Glictronix' argument that Judge Richey's assessment of the trustworthiness of FCC findings in the context of the *SPCC* suit has little bearing on the trustworthiness of the FCC decisions regarding the PCA tariff. Moreover, Glictronix argues that the substantive conclusions of *SPCC* are cast in doubt by the contrary holding in *MCI v. American Tel. & Tel. Co.*, 708 F.2d 1081 (7th Cir.1983).

*SPCC* involved different but related issues dealing with AT & T's interconnection policies. Although *SPCC* dealt with AT & T's so-called "telpole" tariff, Judge Richey noted that Hinchman testified that his staff wrote all of the FCC decisions relating to telecommunications from 1974 to 1978. Hinchman recalled no changes being made by the Commissioners to staff recommendations, and was himself "totally unfamiliar with the basis for any of the decisions for which he was responsible and did not even understand the concepts involved." *SPCC, supra,* 556 F.Supp. at 1055. It is clear that Judge Richey doubted the trustworthiness of all the decisions rendered under Hinchman, not just those specifically at issue in *SPCC.*

Taking into account the concrete basis for Judge Richey's skepticism—Hinchman's own testimony—and the acknowledged importance of the FCC decisions to the *Litton* verdict, I think this new evidence should preclude collateral estoppel effect to the *Litton* findings on the reasonableness of AT & T's PCA/certification policies.

3. Unfairness to AT & T: The Question of Underlying Confidence in the *Litton* Judgment.

AT & T's final argument is that it would be unfair to preclude AT & T from relitigating the *Litton* findings because "underlying confidence" in the *Litton* judgment is lacking. Central to AT & T's opposition to the partial summary judgment motion is its position that the *Litton* judgment was based on a demonstrably false premise. That premise was that after *Carterfone* AT & T knew that the FCC's basic position was that AT & T could not exclude customer-provided terminal equipment absent a showing of actual harm and that "neither filing of the interface tariff nor opposition to certification squared with the FCC's mandate in *Carterfone." Litton, supra,* 700 F.2d at 810. According to AT & T, the *Litton* court's affirmance of the jury finding that AT & T acted in bad faith to monopolize the PBX and key system market by filing the PCA tariff and by opposing certification was based on this allegedly false premise.

The *Litton* court relied on a number of AT & T internal documents to support this premise that AT & T adopted the PCA tariff and opposed certification in bad faith. *Litton, supra,* 700 F.2d at 791 n. 2, 798–801, 810–11. Among these internal documents were statements of AT & T officials to the effect that AT & T had been unable to produce any evidence that interconnection of non-AT & T equipment harmed the network. An in-house report prepared in 1971 by David Beyers, one of AT & T's two representatives to the FCC's PBX Advisory Committee, wrote:

A Credibility Gap Exists—[L]imited interconnection on the message network and greater interconnection on private line facilities has been in existence for a long period of time and the carriers still find it virtually impossible to cite cases of harm ... result[ing]] from ... interconnect[ion] ... This inability to demonstrate cases of harm ... is causing the manufacturers ... users and regulatory bodies to ... challenge the expansive efforts which [AT & T] insists must be taken to avoid the network pollution.

(*quoted in Litton, supra,* 700 F.2d at 799.)

In August, 1972, H.H. Boettinger, director of AT & T's Management Sciences Division reported:

Here is our weakest position now, because even though everyone concedes

that serious breaches of our tariffs by illegal or unauthorized equipment has grown over the years, we have not been able to produce evidence of harm to anyone. (I understand that our people on the PBX Certification Committee have been unable to respond with any forceful data when asked for proof of our allegations of potential harm.)

Plaintiff's Ex. 58, A–455 at 460 to 461. The report recommended that the PCA requirement be rescinded. *See Litton, supra*, 700 F.2d at 799. AT & T's only evidence of potential harm was derived from studies, referred to as the "Hunt Studies", which various AT & T officials conceded did not prove anything. *See Litton, supra*, 700 F.2d at 799.

According to evidence submitted in *Litton*, AT & T knew that the PCA device was unnecessary and duplicative of components in the competitors' equipment, but it enforced the PCA requirement so as to hamper competition and delay the inevitable advent of a certification system until AT & T had developed products which could compete effectively in the terminal equipment market.

In 1967, AT & T organized a group of senior executives of AT & T and Bell subsidiaries and affiliates, called the Tariff Review Group, which was charged with the responsibility of formulating a policy in response to the expected ruling in *Carterfone*. In February, 1968, a Special Task Force to the Review Group issued one of its reports. (Appendix to Plaintiff's Class Certification Brief, Exhibit 55.) The Task Force first summarized its conclusion that:

> Any attempt to propose the use of an interface requirement ... can be interpreted merely as a shifting of our present-day restrictions on customer-owned devices to similar restrictions through the provision of an arbitrary and redundant Telephone Company device that duplicates the customer's equipment.

*Id.* at 423. Expanding on this conclusion, the report states:

> An attempt to design an interface, or a family of interfaces, sufficient to minimize all adverse effects of customer-provided equipment poses an economic and administrative problem ... [S]uch an interface device would be priced at a level of at least what our existing equipment offering is now. This would, of course, result in what effectively might be considered to be an unjustified economic restriction in allowing customer to provide his own device. And the provision of an interface does not, in itself, necessarily provide the full protection we desire ...

*Id.* at 423–24. The report explicitly rejected the PCA requirement and endorsed technical certification standards, stating that the PCA requirement "would erect a redundant, artificial and economic barrier to those wishing to purchase their own equipment." *Id.* at 425.

According to the Litton plaintiffs and Glictronix, AT & T persisted in advocating the PCA requirement and opposing certification because it was aware it could not compete effectively in the terminal equipment market and needed to buy time to develop competitive equipment. The First Task Force Report concluded that AT & T would lose a considerable share of the terminal equipment market if the PCA tariff was struck down, and stated, "[i]f we cannot compete with outside manufacturers of terminal equipment, we may be forced to drop out of the market." (Appendix to Plaintiff's Class Certification Brief, Ex. 11, 54–A–388 to A–397).

Despite AT & T's persistence in claiming that the PCA was necessary to protect the telephone network from harm, it has never offered any proof that competitors' equipment was inferior to AT & T provided equipment. *Id.* at Ex. 59, A–464. Indeed, its own records reveal a knowledge and fear that its product offerings lagged significantly behind in terms of quality and features. *Id.* at Ex. 67, A–505.

At the trial of *Litton, supra*, a former AT & T executive testified that the PCA requirement was "predicated upon the as-

sumed inferiority of the competitors' equipment," an assumption "we knew to be false." *Id.* at Ex. 60, A–469. In 1972, an AT & T executive stated that he had recently seen many competitive PBX and key systems "clearly in the same league—in terms of features, price and quality—with the best BTL ([Bell Labs] designs." *Id.* at Ex. 61, A–471. In February 1972, Bell Labs Quality Assurance Division found that competitive PBX systems had lower trouble rates than Bell PBX systems. Id. at Ex. 61, A–474 at 480.

It has been admitted by AT & T's own high level executives that in the early 1970's, with the advent of competition, customers began asking AT & T for newer and better equipment with more features and flexibility, equipment that AT & T knew it did not offer. *Id.* at Ex. 63, A–489; Ex. 64, A–492; Ex. 65, A–493; Ex. 66, A–504. AT & T's marketing studies recognized that its weaknesses in furnishing competitive features handicapped its sales efforts. *Id.* at Ex. 67, A–505; Ex. 68, A–511 at 518 and 539. In a 1971 status report to Bell Labs management on product development, J.W. Schaefer, the Bell Labs Executive Director in charge of PBX Development, admitted that Bell had "neglected PBX development" and that its PBX systems were antiquated. Id. at Ex. 69, A–599 at A–600.

The *Litton* plaintiffs contended that this need to delay the allegedly inevitable abolition of the PCA tariff in favor of certification standards was AT & T's motive for its conduct. There was evidence at the *Litton* trial that AT & T

"did not complete some of its 'homework assignments' on time" in connection with the PBX Advisory Committee's efforts to develop certification standards. AT & T Brief at 20. And, although AT & T had decided in March 1 of 1973 that it would oppose certification standards, it continued to work with the Advisory Committee in accordance with an internal "Tactics Memorandum" which concluded that withdrawing from the committee would accelerate "decisions in favor of certifica-

tion." This evidence is sufficient to support an inference that AT & T did what it could to delay and obfuscate the efforts undertaken by the FCC and other interested parties to develop certification standards.

*Litton, supra,* 700 F.2d at 811.

AT & T's argument that the premise of the *Litton* judgment was false is based on a number of documents. First, AT & T relies on the opinions of several state regulatory agencies, which, until 1974, shared jurisdiction with the FCC over interconnection matters. *See Telerent Leasing Corp.,* 45 F.C.C.2d 204 (1974). According to AT & T, the first such state agency to review the PCA requirement in a formal opinion was the New York Public Service Commission, which found in July, 1969, that a PCA for customer-provided equipment was necessary to protect the network. *New York Tel. Co.,* 79 P.U.R.3d 410, 417 (N.Y.Pub. Serv.Comm'n, 1969) (Defendants' Documentary Submission, Vol. VI, Tab. 1). As is discussed elsewhere, this decision, the only such decision AT & T even offered into evidence in *Litton,* dealt with a PCA for a different type of device at very different costs. While the *Litton* court found that the excluded evidence of this ruling should have been admitted, it found that the exclusion was not prejudicial error.

Second, AT & T argues that the FCC itself considered the PCA requirement and found it reasonable. According to AT & T, the FCC explicitly stated on at least five occasions that the PCA requirement in the post-*Carterfone* tariffs did not violate the FCC's policy enunciated in *Carterfone.* (See Defendants' Collateral Estoppel Brief, at 57.)

The first of these cited rulings dealt with the contention that the *Carterfone* ruling not only invalidated the complete ban on the use of customer-provided terminal equipment, but also invalidated the barring of "any customer-provided network control signaling units irrespective of whether they were harmful or harmless" to the network. *AT & T "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605, 609 (1968). The

F.C.C. stated that this contention was based on a "misconstruction of *Carterfone,* and clarified that *Carterfone* had not addressed equipment providing network control signaling functions. (*Id.* at 609–10).[7] The Commission refused to strike down AT & T tariffs banning such customer-supplied equipment.

However, the ruling also made clear that while *Carterfone* did not invalidate a blanket ban on such equipment, it did not approve such a ban. The FCC stated:

> Although the tariff bar against any customer providing his own network control signaling unit is not in conflict with our Carterfone ruling, the question remains as to whether the telephone companies should make provision in their tariffs by which subscribers may have access to the so-called switched telephone network through the use of their own provided network control signaling equipment. On the basis of the pleadings and comments before us, we are in no position to determine the extent to which any such provision may be consistent with efficient and economic telephone service and otherwise in the public interest. In our opinion, these and other matters warrant further consideration by the Commission before it determines whether and what further action, if any, may be required.

*AT & T "Foreign Attachment" Tariff Provisions, supra,* 15 F.C.C.2d at 610. Consistent with this wholly noncommittal approach, the FCC concluded its ruling by warning, "[o]ur action is not to be construed as approval [of the PCA tariff] and these tariffs are subject to such further actions as the Commission may wish to take with respect thereto." (*Id.* at 611).

In *AT & T "Foreign Attachment" Tariff Revision,* 18 F.C.C.2d 871 (1969), the FCC reiterated its conclusion that *Carterfone* had neither disapproved nor approved AT & T's ban on signaling equipment irrespective of the question of harm. The Commission stated that there was nothing in the

memorandum opinion of December 29, 1968 (15 F.C.C.2d 605) "from which it can reasonably be inferred that a final conclusion has been reached with respect to what portions of an interconnected communication system may be provided by customers". 189 F.C.C.2d at 874.

In *Interstate and Foreign MTS and WATS,* 35 F.C.C.2d 539 (1972), the FCC gave notice of an inquiry to determine whether and under what conditions the telephone companies should provide new classes of interstate and foreign service "whereby customers would have the option of furnishing 'Network Control Signalling Units' (NCSU) and any needed 'Connecting Arrangements' (CA) (or the functional equivalent thereof) that are presently furnished only by the telephone company." *Id.* at 539. Specifically the FCC stated:

> Our proceeding herein is concerned with the pending and unresolved basic issues now before us as to whether and to what extent, there is public need for us to go beyond what we ordered in *Carterfone* and permit customers to provide in whole or in part the aforementioned NCSUs and CA's in interstate MTS and WATS and, if so, what terms and conditions should apply to protect the telephone system and services of others.

*Id.* at 542.

The FCC opinions in *Telerent Leasing Corp.,* 45 F.C.C.2d 204, 206 (1974) and *Mebane Home Telephone Co.,* 53 F.C.C.2d 473, 476 (1975) similarly indicated that the *Carterfone* ruling had not decided the question of whether and under what conditions customers could provide their own NCSUs.

However, in *Mebane,* the FCC took a position on whether AT & T would be permitted to absolutely ban customer-provided equipment, such as the PBX or key systems, which substituted for part of the network. After reviewing previous decisions, the FCC stated:

---

**7.** This distinction is apparently the distinction drawn elsewhere between equipment which is connected to the network and equipment which

is substituted for part of the network. See *Mebane Home Telephone Co.,* 53 F.C.C.2d 473, 477 (1975).

The foregoing adequately demonstrates the broad principle underlying *Hush-A-Phone* and *Carterfone*, namely the subscriber's right to make beneficial use of an interconnected device without causing harm to the telephone company's operations. We see no reason why this broad principle should not extend to interconnected devices such as PBX's and key systems which may replace telephone system equipment. Clearly, the customer would obtain the requisite benefit from such interconnection. Thus, the only question remaining regarding the applicability of the broad principle underlying *Hush-A-Phone* and *Carterfone* to interconnected devices such as PBX's and key systems is whether such interconnection would be harmful to the telephone company's operations. Significantly, we have had substantial experience under the AT & T customer interconnection tariffs which do permit interconnection of customer devices such as PBX's and key systems. Indeed, PBX's and key systems constitute the heart of interconnection that now exists. Our experience indicates that not only have customers obtained substantial private benefit from such interconnection, but there has been no technical harm to telephone company operations. Nor has *Mebane* alleged any facts showing that interconnection of PBX's or key systems would be technically harmful. Moreover, as shown below, *Mebane* has made no prima facie showing warranting summary relief or hearing on economic injury grounds, although we have decided to afford it an opportunity to make such a showing in an evidentiary hearing on our own motion. Under the foregoing circumstances, we believe that here as in *Carterfone* it would be unjust, unreasonable to restrict the customer's right to use beneficial, interconnection devices that are not publicly detrimental, through a blanket prohibition against interconnection of devices that may involve some substitution of telephone company equipment. The determining factor should be whether there is harm to the telephone network, irrespective of whether the particular interconnection device is one of the nature involved in *Carterfone* or a PBX or key system. To make a distinction based solely on whether there is a substitution of telephone company equipment, would be an arbitrary and unreasonable infringement of the subscriber's right in the absence of technical harm or other public detriment. A subscriber has a statutory right under Section 201(b) not to be subjected to tariff restrictions which indiscriminately bar interconnection of customer-provided equipment without regard to harm. Moreover, as noted above, the option of the customer to interconnect his PBX or key system is a service that has been generally available to the public under the AT & T tariffs for several years.

AT & T also relies on the statements of various individual FCC officials, who believe that the *Litton* court mischaracterized the *Carterfone* ruling. (See memorandum of former FCC Commissioner Benjamin L. Hooks as Amicus Curiae in Litton, March 1, 1983, Defendants' Collateral Estoppel Brief, Appendix, Tab 4; Deposition of Bernard Strassburg, Chief of the FCC's Common Carrier Bureau from 1963 to 1973, pp. 74, 123, Defendants' Documentary Submission, Volume XA, Tab 1.) The FCC itself has filed an amicus brief in the *Faucett* case contending that the *Litton* conclusions were "demonstrably incorrect."

Glictronix correctly points out that the statements of individual FCC officials merely reflect personal views. Similarly, the FCC amicus brief is not a formal opinion of the FCC, but only an interpretation by current FCC counsel of post FCC rulings. Also the amicus brief contains no analysis supporting its conclusion.

It is clear from review of these rulings that the FCC did not believe that *Carterfone* specifically invalidated the PCA tariff. Nor do these rulings evince FCC approval or support for the tariff.

As in this case, AT & T attempted in *Litton* to counter the evidence of its bad faith by arguing that the FCC supported

the imposition of the tariff. AT & T's implicit argument was—and is—that if a presumably impartial governmental body believed the requirement necessary, then AT & T could not have been acting in bad faith when it argued that the tariff was necessary. The *Litton* court specifically addressed this contention:

> AT & T claims that certain FCC proceedings occurring prior to the adoption of certification standard regulations had the effect of placing the FCC's imprimatur upon the PCA requirement. See *Telerent Leasing Corp.*, 4 F.C.C.2d 204 (1974), aff'd sub nom. *North Carolina Utilities Comm'n v. FCC*, 537 F.2d 787 (4th Cir.) *cert. denied*, 429 U.S. 1027, 97 S.Ct. 651, 50 L.Ed.2d 631 (1976); *AT & T-Mebane Home Telephone Co.*, 53 F.C.C.2d 473 (1975). It is difficult to see how either of these decisions can be read to qualify the FCC's earlier, explicit statement that it was not approving the proposed tariffs, however. *Telerent* was a declaratory judgment order expressing the Commission's disapproval of a state utility commission's proposed rule that would absolutely prohibit the interconnection of customer-provided equipment on any intrastate portion of the telephone network. The Commission held that the proposed rule was contrary to the thrust of *Carterfone* and recently instituted proceedings considering the possibility of liberalizing the post-*Carterfone* tariffs. In *Mebane* a local telephone company sought exemption from so much of the post-*Carterfone* tariffs as allowed interconnection of customer-provided equipment. Although the Commission upon its own motion granted the local carrier an opportunity to demonstrate the need for a waiver from the tariffs on the basis of economic injury, it specifically ruled that, under *Carterfone,* customers must generally be allowed to provide their own equipment.

*Litton, supra,* 700 F.2d at 792 n. 12.

■ AT & T correctly argues that the doctrine of collateral estoppel is premised on an "underlying confidence in the correctness of the judgment relied on." *Stan-*

*defer v. United States,* 447 U.S. 10, 23 n. 18, 100 S.Ct. 1999, 2007 n. 18, 64 L.Ed.2d 689 (1980); Restatement (Second) of Judgments § 29, Comment f. It contends that FCC rulings after *Carterfone* as well as various other evidence undercuts the *Litton* finding that after *Carterfone* AT & T knew that the PCA tariffs were inconsistent with the mandate of *Carterfone.*

In assessing this contention it is important to specify just what *Litton* held. The crucial passage states:

> [T]he clarity of the Commission's language was such that from AT & T's perspective it had to be clear as a bell, so to speak, that at least as of the 1968 *Carterfone* decision, if not before, it was unreasonable, unjust, and discriminatory to prohibit interconnection of terminal equipment without respect to any harm such devices might cause.

*Litton, supra,* 700 F.2d at 794. The salient point of this passage is its focus on AT & T's state of mind as opposed to what position the FCC had taken. Through most of the relevant period after *Carterfone* and before the adoption of certification standards, the FCC took a hands-off position regarding the PCA tariff. It explicitly stated that it neither approved nor disapproved this tariff, which AT & T was imposing on its customers.

On several occasions, the FCC arguably went further, and suggested that the PCA tariff was consistent with *Carterfone.* But the importance of such statements must be entirely dependent on what information the FCC had at its disposal when making them. If it assumed, as AT & T continually claimed at the time, that uncontrolled interconnection posed grave dangers to the network, then it could have reasonably believed that the PCA requirement was consistent with *Carterfone.*

However, the *Litton* court found—and no persuasive evidence has been submitted to controvert this finding—that the jury could reasonably have concluded that the claim of potential harm to the system was baseless. Certainly, there could be no bet-

ter evidence of the lack of actual harm than AT & T's own admission that despite thousands of unauthorized interconnections AT & T could document no harm to the network.

Had the FCC known what the *Litton* jury apparently believed—that there was in fact no actual harm to the network from interconnection—it might have concluded that the PCA tariffs violated *Carterfone.*

The post-*Carterfone* rulings only attacked the assertion that *Carterfone* prevented all prohibitions against customer-supplied terminal equipment regardless of whether they were harmful or harmless. They did not suggest that interconnection could be absolutely banned where there was no evidence of harm.

In *AT & T "Foreign Attachment" Tariff Revisions,* 15 F.C.C.2d 605, 609 (1968), *re-con. denied,* 18 F.C.C.2d 871 (1969), the FCC stated "[w]e were concerned in [*Car-terfone*] with the lawfulness of tariff provisions that prohibit a customer from making harmless interconnection of his terminals" with the network. Judging from this formulation of the meaning of *Carterfone,* it seems reasonable to assume that if the FCC had known at the time that the allegation of harm from interconnection was baseless, it would have held that the PCA tariff conflicted with *Carterfone.* Meanwhile, AT & T, which knew of the nonexistence of evidence of harm, did know that the PCA tariff was inconsistent with *Car-terfone.* It was on AT & T's knowledge that its liability in *Litton* could reasonably have been based.

I would conclude that the *Litton* decision merits confidence for collateral estoppel purposes, but for the possible unreliability of the later FCC rulings promulgated under Walter Hinchman. I do not believe AT & T has shown that the *Litton* decision was based on a "false premise." But the possibility that Hinchman's rulings were written to set a predicate for antitrust liability and the fact that these rulings were relied on by the jury in reaching its verdict strongly suggests that *Litton* should not be given preclusive effect in this case.

### E. *Miscellaneous Issues*

It is clear that application of collateral estoppel is inappropriate regarding some of the issues for which Glictronix requests it. These issues include the definition of the relevant product market and the findings that AT & T delayed the provision and installation of PCAs, refused to sell inside wiring at all or on a reasonable basis, and delayed making cutovers.

 Litigation of the relevant market cannot be precluded because the parties in *Litton* stipulated to this issue rather than litigated it. See Restatement (Second) of Judgments § 27 comment e. In *Litton,* there were no findings as to whether AT & T delayed or refused services to Glictronix. Therefore, the litigation of AT & T's conduct toward Glictronix cannot be precluded.

### *Conclusion*

For the foregoing reasons, Glictronix's motion for partial summary judgment is denied in full.

### II Class Action Certification

In order to maintain a class action, a plaintiff must demonstrate compliance with the mandatory requirements of rule 23(a), which provides that:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defense of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

 If the initial prerequisites of Rule 23(á) are met, plaintiff must additionally meet the requirements of at least one of the three subsections of Rule (b). Glictronix here seeks certification of the proposed class under Rule 23(b)(3), which provides that an action may proceed as a class action if:

the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.... *Katz v. Carte Blanche Corp.,* 496 F.2d 747 (3d Cir.), *cert. denied,* 419 U.S. 885, 95 S.Ct. 152, 42 L.Ed.2d 125 (1974); *Young v. Jo-Ann's Nut House, Inc.,* 1980–81 Trade Cas. (CCH) ¶ 63,746 at 77,790 (D.N.J.1980). To support certification, common issues need only predominate; they need not be dispositive of the entire litigation. *State of Illinois v. Harper & Row,* 301 F.Supp. 484, 489 (N.D.Ill.1969).

■■■■■ The burden of demonstrating fulfillment of the conditions outlined in Rule 23 for maintenance of a class action lies with the moving party. *Katz v. Carte Blanche Corp., supra.* The strength of a plaintiff's case on the merits is not to be considered in determining whether a class should be certified. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 176, 94 S.Ct. 2140, 2151, 40 L.Ed.2d 732 (1974). There is no requirement of a prima facie showing of merit in a class action to support certification. *City of Philadelphia v. American Oil Co.,* 53 F.R.D. 45, 61 (D.N.J.1971); *accord Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970). However, some analysis of the substantive claims and the essential elements needed to establish those claims is necessary for thorough evaluation of whether the requirements of Rule 23 have been met. *Chmieleski v. City Products Corp.,* 71 F.R.D. 118, 127 (W.D.Mo.1976). Therefore, "a preliminary hearing addressed not to the merits of plaintiff's individual claim but to whether she is asserting a claim which, assuming its merit, will satisfy the requirements of Rule 23 has never been regarded as violative of the Rule stated in *Eisen....*" *Cobb v. Avon Products, Inc.,* 71 F.R.D. 652, 654 (W.D.Pa.1976).

Having chosen to seek certification under Rule 23(b)(3), Glictronix must satisfy the requirements of that rule and the requirements of Rule 23(a)(1)–(4). AT & T contends that class certification should be denied for four reasons. First, it claims that Glictronix cannot satisfy the Rule 23(a)(3) and (4) requirements that it can adequately represent a class of competitors and that its claims are typical of the claims of the members of the proposed class. AT & T also asserts that Glictronix has not met the Rule 23(b)(3) requirements that common questions predominate over individual question or that a class action is the superior method of adjudicating this controversy. AT & T concedes that Glictronix has met the Rule 23(a)(1) numerosity requirement. It addresses the issue of whether there are common questions only in the context of Rule 23(b)(3) analysis, and not under Rule 23(a)(2).

### A. *Typicality*

AT & T contends that Glictronix claims cannot be typical of those of the proposed class members because Glictronix markets only a few of the numerous varieties of PBXs and key systems marketed by the class members. AT & T states that under current FCC rulings whether or not a PCA will be required turns on the quality and technical characteristics of the equipment and on the quality of each individual installation. Therefore, AT & T contends, the assessment of whether the PCA requirement was reasonable must be individually made for each different type of equipment and each installation. According to this theory, Glictronix's claims, based on its own equipment, cannot be typical of the claims based on other equipment. Whether the existence of an antitrust violation and proof of antitrust injury can be shown by common evidence for the different equipment marketed by the various class members will be addressed later. The question here is merely whether the named plaintiffs claims are typical.

Despite the diversity of types of PBXs and key systems, this equipment has consistently been viewed as a unit. In the *Litton* litigation the relevant market was defined as all PBXs and key systems. No differentiation was made among the vari-

ous types of PBXs and key systems. Furthermore, AT & T was unable to produce any concrete evidence of harm to the network from any type or brand of terminal equipment. The contention that Glictronix's claims are atypical because of differences in harm to the system is belied by the general lack of evidence of harm, which is documented in AT & T's own internal papers.

In support of its argument, AT & T relies heavily on *Am/Comm Systems, Inc. v. American Tel. & Tel. Co.*, 101 F.R.D. 317 (E.D.Pa.1984), discussed earlier in connection with Glictronix's motion for partial summary judgment. As Glictronix makes clear, the proposed product market in *Am/Comm* included a wide variety of products besides PBXs and key systems including burglar alarms, automatic dialers, and many others. Not surprisingly, the court found the claims of the class representative, which marketed only some of this diverse array of equipment not typical for Rule 23 analysis. The *Am/Comm* ruling therefore has little bearing on the question of typicality in this case.

Glictronix's claims are typical of those of the class.

## B. *Adequacy of Representation*

The Rule 23(a)(4) requirement that a class representative "fairly and adequately protect the interests of the class," encompasses two inquiries: (1) whether plaintiff's counsel is competent and (2) whether the named plaintiff has "interests antagonistic to those of the class." *Wetzel v. Liberty Mutual Insurance Co.*, 508 F.2d 239, 247 (3d Cir.), *cert. denied*, 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Conceding the competence of plaintiff's counsel, AT & T contends that Glictronix has interests antagonistic to those of other class members.

The basis of Glictronix's claim in this case is that it was foreclosed from a share of the terminal equipment market by AT & T's allegedly illegal anticompetitive conduct. Proof of damages for such loss of a share of the market is measured by lost profits or sales. AT & T contends that where the proposed class members are competitors in the relevant market, the need to assess damages by lost sales or profits places class members in conflict with one another and makes it impossible for the representative plaintiff to adequately represent the other class members.

This was the holding in *Am/Comm*, where Judge Bechtle denied plaintiff's motion for class certification against AT & T. *Am/Comm, supra*, 101 F.R.D., at 321–322. Other cases in the Third Circuit consistently support the view that where the class members are competitors in a limited market, the named plaintiff's attempts to maximize its damage recovery will conflict with the interests of the other class members and class certification should be denied. *Franklin Container Corp. v. International Paper Co.*, 1983–2 Trade Cas. ¶ 65,727 at 69,722 (E.D.Pa.1982); *Chestnut Fleet Rentals, Inc. v. Hertz Corp.*, 72 F.R.D. 541, 544–45 (E.D.Pa.1976).

Glictronix tries to distinguish *Chestnut* and *Franklin Container* on the ground that these cases involved "fixed" or "limited" markets which created conflicts among the class members which do not exist here. It implies that the market in this case is practically unlimited and that all the class members can show profits and sales lost to AT & T without anyone of the members ever claiming it would have made particular sales which another member also claims for itself.

There is no basis for Glictronix's attempted distinction between a limited and unlimited market here. The market for terminal equipment is limited just as were the markets in *Franklin Container* and *Chestnut Fleet*. See *Am/Comm, supra*, at 321–322.

Glictronix cites a number of cases in which it claims classes composed of competitors were certified. These cases do not support Glictronix contentions. In some, the fact that the class members were competitors was unrelated to the claims raised. *Philadelphia Electric v. Anaconda Amer-*

*ican Brass,* 43 F.R.D. 452, 463 (E.D.Pa. 1968); *Sunrise Toyota, Ltd. v. Toyota Motor Co.,* 55 F.R.D. 519 (S.D.N.Y.1972); *Gold Strike Stamp Co. v. Christensen,* 436 F.2d 791 (10th Cir.1970). In another, the plaintiff requested class certification only as to the allegations regarding which there was no conflict among the class members. *Hawkins v. Holiday Inns Inc.,* 1975–1 Trade Cas. ¶ 60,153 at 65,464 (W.D. Tenn.1975).

Finally, Glictronix invokes *Siegel v. Chicken Delight, Inc.,* 271 F.Supp. 722 (N.D.Cal.1967), where the court stated that class members "whose interests are antagonistic to those of their brethren ... may by order be excluded from the suit." *Id.* at 728. *Siegel* did not involve claims of lost profits from a lost share of the market. It is unclear from the opinion what type of antagonisms the court contemplated, but certainly they were not the pervasive conflicts which arise in the lost share of the market context. The fact that the court suggested that the antagonisms could be dealt with by excluding some class members indicates that relatively few conflicts were contemplated. This is very different from the lost profit context where one may anticipate that there may be conflicts among or between all of the class members.

At least one case in the Third Circuit suggests that a class representative may be adequate under rule 23(a)(4) in a case where class members' claims are based on business not done where there are "objective guidelines for apportioning individual damages among the class members." *Al Barnett & Son v. Outboard Marine Corp.,* 64 F.R.D. 43, 50–51 (D.Del.1974), *aff'd,* 611 F.2d 32 (3d Cir.1979).

▇ Glictronix claims its expert's methodology, based on the Competitive Activity Reports compiled by AT & T constitutes just such objective guidelines. While Glictronix's methodology may provide a relatively accurate formula for allocating damages, it certainly will not prevent all conflict among the class members.

The methodology only permits recovery based on applications by class member interconnect companies to AT & T for a PCA. Glictronix's theory is that the interconnect company which got far enough with a customer to request a PCA is the company which would have made the sale in the absence of AT & T's anticompetitive practices. But under this approach, as Glictronix admits, class members which dropped out of the market or delayed entering it because of AT & T's practices would be foreclosed from recovery. Certainly, they would dispute the allocation of damages which would result from Glictronix' methodology.

In addition, while it may be true in most cases that the company which requested a PCA would have made the sale, the theory ignores possible competition among rival interconnect companies which may have gone on prior to the request and which may have been affected by AT & T's anticompetitive practices.

Despite the existence of the Competitive Activity Reports, this remains a "lost profits" case in which class members' interests are adverse to one another. Glictronix cannot adequately represent its rivals in the interconnect business.

### C. *Predominance of Common Questions*

▇ In order to certify a class under Rule 23(b)(3), the court must find that common issues predominate over individual ones. In an action under Section 1 of the Sherman Act, a plaintiff must establish (1) an antitrust violation; (2) causation (that plaintiff suffered antitrust "impact" or "injury in fact"), and; (3) the amount of damages. *American Bearing Co., Inc. v. Litton Industries, Inc.,* 729 F.2d 943, 948 (3d Cir.1984). In order for a class to be certified in an antitrust action under Rule 23(b)(3), plaintiff must demonstrate that both the violation and fact of injury can be proved for the entire class by common evidence. The amount of damages can be established individually for each class member. *Bogosian v. Gulf Oil Co.,* 561 F.2d

434, 454–55 (3d Cir.1977), *cert. denied,* 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978). AT & T contends that Glictronix cannot establish an antitrust violation or fact of injury by common evidence.

### 1. *Antitrust Violation*

Glictronix's complaint alleges antitrust violations under both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Under Section 2, Glictronix alleges monopolization, attempted monopolization and conspiracy to monopolize. Under both Sections 1 and 2, it alleges a combination in restraint of trade among the defendants to institute an illegal tying arrangement. According to Glictronix:

> By enforcing a "tie-in" between the use of telephone terminal equipment provided by Bell and the lack of a need to lease unnecessary and useless PCAs from Bell, defendants violated 15 U.S.C. Sec. 1.

Plaintiffs Brief in Support of Motion for Class Certification, p. 68.

Defendants allegedly carried out these antitrust violations by requiring the use of PCAs and opposing certification and by undertaking various activities to discourage customers from switching from AT & T to competitors' equipment. These activities allegedly included delaying installation of and improperly installing PCAs, refusing to sell inside wiring or refusing to do so on a reasonable basis, sabotaging inside wiring obtained by plaintiff, subjecting competitors to unfair and expensive cutover tactics, and disparaging competitors' equipment.

AT & T claims that whether or not its requirement of a PCA constitutes an antitrust violation can only be determined on an individual basis. Under present FCC rulings, a PCA is required for all terminal equipment which either does not meet FCC standards or which was not installed in conformity with FCC standards. There-

fore, AT & T reasons, Glictronix would have to establish an antitrust violation as to each class member by individual showing that each member's equipment would not be required under present FCC standards to use a PCA. In effect, AT & T argues that an antitrust violation cannot be established without an assessment of the reasonableness of the PCA requirement as to each class member's equipment.

AT & T's position mischaracterizes Glictronix's claims. To establish an antitrust violation, Glictronix does not need to show that the imposition of a PCA requirement was unreasonable in every case. Rather, Glictronix alleges that by imposing a blanket requirement of a PCA and opposing establishment of a systems of registration standards (under which it would be possible to determine whether or not particular equipment needed a PCA), AT & T sought to monopolize the relevant market and establish an illegal tie-in. Proof of unreasonableness is not an element of Section 2 monopolization claims. *See e.g. U.S. v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966). Tying arrangements are normally per se Section 1 violations. *Northern Pacific Ry. Co. v. United States,* 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). There is no reason to believe this case does not fall within the general rule governing tie-ins.[8] Therefore, contrary to AT & T's suggestion, proof of the unreasonableness of the restraint is not necessary to establish the antitrust violations alleged. Whether AT & T's PCA requirement constituted an antitrust violation is susceptible of common proof. The violation would be established, if at all, by evidence of AT & T's conduct, and not by individualized analysis of the various class members' equipment and installations.

AT & T contends that Glictronix's claims of anticompetitive activities, such as refusal to sell inside wiring and the like, must

---

**8.** In *Jefferson Parish Hospital District No. 2 v. Hyde,* —— U.S. ——, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984), the Supreme Court reaffirmed the general per se rule in tie-in cases, but found that it did not apply in the particular circumstances of that case, where the tying arrangements did not restrain trade on the merits by forcing purchases that would not otherwise be made. This case bears little resemblance to *Jefferson Parish,* and the per se rule should apply.

necessarily be considered individually and are inherently episodic. However, to establish a violation, Glictronix need not individually establish AT & T's conduct vis-a-vis each class member. It can show a violation by establishing that AT & T engaged in an orchestrated attempt to damage and harass competitors in the interconnect business. It can do so by introducing proof of a pattern of conduct.

### 2. *Fact of Damage.*

■ Proof of impact is an essential element of an antitrust action and must be provable on a common basis in order for a class to be certified. *See Bogosian, supra,* 561 F.2d at 454–55.

■ To prove impact, a plaintiff must show that he suffered some loss in his business or property and that there is a causal relationship between the antitrust violation and the loss. *Bogosian, supra,* 561 F.2d at 454. Impact is a distinct element of liability, independent of proof of a violation and independent of the matter of individual damages.

Fact of damage is susceptible of common proof. "[T]here is no reason why proof of the impact cannot be made on a common basis so long as the common proof adequately demonstrates some damage to each individual." *Bogosian, supra,* 561 F.2d at 454.

The *Bogosian* court strongly implies that where damages must be shown on the basis of lost profits, the plaintiff will not be able to show fact of damage through common evidence. *Id.* at 455. But at least concerning the PCA requirement, Glictronix makes a plausible argument that fact of damage can be proved on a common basis.

Based on its experts' affidavits, Glictronix contends that each of the members of the class suffered at least some damages from the PCA requirement in two ways.

First, the PCA added significantly to the cost of their equipment and thereby reduced the volume of sales. Second, the class members all lost profits because the added cost of the PCA forced them to lower the prices of their equipment in order to stay competitive with AT & T. While the actual extent of damages may require individualized proof, Glictronix contends that the fact of damage in the form of lower profits on sales made and lost sales can be commonly established for all class members from the existence and effects of the PCA tariff.

AT & T's expert finds two flawed assumptions behind Glictronix's fact of damage analysis. The first is the assumption that but for the PCA tariff, all the class members would have been able to market their equipment without PCAs. According to AT & T, this assumption is proved wrong by the fact that even under present FCC rulings, equipment and installations which do not meet FCC certification standards are obligated to use a PCA. The manufacturers or sellers of equipment still needing a PCA cannot show fact of damage, according to AT & T. I find this argument persuasive.[9]

Glictronix's second false assumption, according to AT & T, is that each class member would have made more sales and more profits had certification standards replaced the PCA tariff sooner. AT & T's expert Phillips contends that had registration occurred sooner some interconnect companies would have improved their market position and some would have suffered diminution or complete loss of their market shares. Glictronix's expert Pratt agreed in the study he helped create in *Litton* with Phillips' conclusion. Phillips argues from the fact that some companies would have suffered from earlier registration that fact of injury cannot be established on a common basis.

---

**9.** It is conceivable that none of the class members' equipment would need a PCA under the present FCC standards. However, as pointed out by AT & T at oral argument, it would be Glictronix's burden to establish this fact. It has

made no effort to do so. In addition, AT & T has specifically alleged that certain of the class members' equipment, such as equipment which cannot prevent power surges, would be required to use a PCA under present FCC standards.

It appears inevitable that an individualized assessment of the market position of each class member would be necessary to determine whether the member would or would not have increased its actual sales and profits absent the PCA tariff. Similarly, individualized analysis would be necessary to determine whether companies which left the marketed or delayed entering it suffered any damage.

The allegation that the plaintiff class was damaged by the delay in adoption of registration standards is only one of Glictronix's claims. With regard to many of the other claims, fact of damage also cannot be commonly proved. These claims include (1) delay in providing and installing PCAs; (2) refusal to sell inside wiring at all or on a reasonable basis, and; (3) delay in interconnecting competitors' terminal equipment. Proof of fact of damage on each of these claims will require individual investigation as to each class member.

For all the reasons given above, fact of damage cannot be established on a common basis.

### D. *Superiority of Class Action*

Rule 23(b)(3) requires a plaintiff to prove that a "class action is superior to other available methods for the fair and efficient adjudication of the controversy." The rule also sets out four criteria relevant to the inquiry regarding superiority:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

In applying these criteria in *Am/Comm*, the court determined that a class action was not the superior method for adjudication. It stated:

(1) The members of the proposed class would presumably want to litigate on their own due to the conflicting interests among the members regarding damages. (2) There is a need for a determination of the reasonableness of the PCA requirement on a product-by-product basis. (3) it is alleged that a number of individual related cases have already been filed against defendants, a factor which weighs against class certification. *Bogus v. American Speech & Hearing Asso.*, 582 F.2d 277, 278, [Sic; see p. 290] n. 17 (3d Cir.1978) (citing Comments of Advisory Committee on Civil Rules, 39 F.R.D. 69, 104). And finally, (4) this case could become entirely unmanageable due to individualized proofs of violation and impact. Accordingly, a class action in this case would not be a superior method of adjudication.

*Am/Comm Systems, supra,* 101 F.R.D., at 323.

The determination concerning superiority is more difficult in this case. As discussed earlier, there was an extremely wide range of products at issue in *Am/Comm*. It was because products other than PBX's and key systems were involved that the court determined that the reasonableness of the PCA had to be assessed on a product-by-product basis. Here there is no such individualized need. Secondly, I am not convinced that members of the proposed class would prefer to litigate on their own. Although there may be conflicts among the members regarding damages, the costs of individually litigating a major antitrust case would lead many members to prefer class treatment. This is particularly true because the denial of Glictronix's motion for partial summary judgment would put Glictronix or any other similarly situated plaintiff to great expense in trying to establish its claim.

On the other hand, other parties have instituted cases similar to this one against AT & T, a factor weighing against class certification because it suggests an interest in individual litigation. *Bogus v. American Speech & Hearing Ass'n.*, 582 F.2d 277, 290 n. 17 (3d Cir.1978). While it is unclear how many cases deal precisely with

the issues raised here (see Plaintiff's Reply Brief in Support of Class Certification at 43–44 n. 13), it seems clear that there is litigation in New York and New Jersey on these issues.

Finally, the individual proofs needed to establish fact of injury on all the plaintiff's claims would render this case unmanageable. On balance, I conclude that class treatment is not the superior method of adjudication of this case.

### Conclusion

Because of the need for individual proof of fact of injury and the inherent conflicts among class members, the motion for class certification must be denied.

Defendants' attorneys are requested to present a form of order consistent with this opinion.